[Civ. No. 918.   First Appellate District.—July 22, 1912.]

# THE FIRST NATIONAL BANK OF SAN FRANCISCO, a Corporation, Appellant, v. WILLIAM K. GOLDEN, Respondent.

BANKS—ORDER ON SAVINGS BANK TO DEBTOR OF COMMERCIAL BANK—DELIVERY OF PASS-BOOK—ASSIGNMENT TO SECURE DEBT—FRAUD OF DEBTOR—EQUITIES—NON-NEGOTIABILITY.—Where an order on a savings bank was given to a debtor of a commercial bank, with the accompanying pass-book for collection, as a conditional payment for land purchased from the debtor, to be returned if the land was not purchased, and said order and pass-book were assigned by such debtor to the commercial bank to secure its debt, and upon discovery of false representations of the debtor as to the land purchased, the depositor notified the savings bank to stop payment of the deposit, and also notified the commercial bank as to such stoppage, it is held that such order with the accompanying pass-book was a non-negotiable chose in action, which was subject, in the hands of the commercial bank, to all equities as between the depositor and its debtor, by reason of whose fraud the transfer was without consideration as to the depositor.

ID.—ASSIGNOR OF DEBTOR NOT ESTOPPED BY ASSIGNMENT TO BANK WITHOUT NOTICE OF FRAUD—VALUE NOT PARTED WITH BY BANK.—The

assignor of the debtor is not estopped from claiming equities as against the commercial bank by reason of the fact that when its debtor made the assignment to such bank it took without actual notice of the alleged fraud, where it appears that no value was parted with by the bank in consideration of such assignment of the order on the savings bank, and it was not prejudiced by reason thereof.

Id.—Rule as to Implied Extensions of Time Inapplicable to Collateral Security.—The rule as to implied extensions of time, which is confined to cases where a new obligation is accepted by the creditor as conditional payment for the original debt, or in which the new obligation, for the time being, at least, is to take the place of and represent the original debt, has no application where the creditor has accepted simply a new additional or collateral security for an antecedent debt, in which case no agreement to give time to pay the original debt is implied.

Id.—Mere Delay in Collecting Deposit Under Rule of Savings Bank not an Implied Agreement to Extend Time—Right to Enforce Payment not Surrendered.—Mere delay in the collection of the order which by its terms is payable on demand, owing to an incidental rule of the savings bank requiring thirty days' notice before withdrawals, does not imply an agreement between the parties for such incidental delay as an extension of the time of payment; and no such extension results as matter of law from the mere receipt of the order assigned as a transaction. In no aspect can the transaction be construed as a contract suspending or surrendering the right to enforce payment.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial. Geo. A. Sturtevant, Judge.

The facts are stated in the opinion of the court.

Cushing & Cushing, for Appellant.

Tobin & Tobin, and S. F. Brittain, for Respondent.

KERRIGAN, J.—In this case a rehearing was granted, but after further consideration, with some minor changes and with the citation of additional authorities, we adhere to our original position.

This is an appeal from a judgment in favor of defendant and from an order denying plaintiff's motion for a new trial.

Prior to the twenty-sixth day of December, 1907, F. H. Rowe was indebted to the plaintiff in the sum of $3,825. On that

date Rowe gave the plaintiff his check on the Canadian Bank of Commerce for the sum of $1,000, and the time for payment of the balance was extended to January 25, 1905. When this check was presented to the Canadian Bank of Commerce it was refused payment for lack of funds to the credit of the maker. Between the 26th and 28th of December the plaintiff was pressing Rowe to make good the amount of the check. On the latter date Rowe, in company with the defendant Golden, called at the bank of plaintiff, and Rowe stated that he was unable to raise the money to meet the check, but that Golden would give the plaintiff an order drawn upon his deposit in the Hibernia Savings and Loan Society for $1,000. Rowe called attention to the fact that said loan society, owing to the financial stringency prevailing at that time, was demanding of its depositors thirty days' notice before paying sums of $1,000 or over. To this observation the plaintiff, through its vice-president, replied, "That is all right. We are quite willing to wait thirty days on the Hibernia Bank, as we know they are absolutely good." Thereupon an order or check in favor of Rowe was drawn by Golden upon said Hibernia Savings and Loan Society, which Rowe transferred to plaintiff by indorsement. Under the conditions upon which deposits are accepted by said society they can be withdrawn only upon presentation of the depositors' pass-book. Accordingly Golden's pass-book was delivered to the plaintiff, and both the order and pass-book were, on December 30, 1907, presented by the plaintiff to one of the tellers of the society, who in effect acknowledged receipt of the thirty days' notice of withdrawal.

Prior to the twenty-sixth day of December, 1907, Rowe and one W. P. McFaul, claiming to be the authorized agents of the Howard Creek Lumber Company, a corporation, were endeavoring to sell to Golden a tract of timber land in Mendocino county together with a sawmill thereon. They represented that this land was thickly covered with practically virgin timber, mostly redwood; that the mill was in first-class condition and capable of producing from twenty thousand to twenty-five thousand feet of lumber daily. Rowe also represented that he was on a sound financial basis, and responsible for any paper he might sign. He referred Golden to Bradstreet's Book, wherein it was estimated that Rowe's resources were about $35,000. On the strength of these representations,

and also believing, as he had been told by Rowe, that someone else was likely to purchase the land, Golden, at the suggestion of Rowe, consented to make a payment of $1,000 on the land and mill, with the understanding that he was to have ten days to decide whether he would purchase the property; that if he decided not to proceed with the transaction the $1,000 was to be repaid to him within sixty days. This contract was reduced to writing December 27th, and on the following morning Rowe and Golden met to arrange for this conditional payment. At that time Rowe remarked to Golden that he had a slight overdraft at the bank of plaintiff, and desired "to make a deposit to show that everything was coming out all right—that he was doing business." Arriving at the bank Golden made the check or order on the Hibernia Society to which reference has already been made and under the circumstances described.

On the afternoon of the same day Golden went to Mendocino county to inspect the property forming the subject of the negotiation, and found that it had been misrepresented to him in material respects. Within the ten days he gave notice to Rowe that the proposition was rejected, and having learned that Rowe had filed a petition in bankruptcy, he stopped the payment of the order on the Hibernia Society and notified plaintiff that he had done so.

January 30, 1908, payment of the draft was refused accordingly, and written notice of protest was served on the parties thereto.

August 18, 1908, the plaintiff filed a claim against the bankrupt estate of Rowe for the full amount of the indebtedness, to wit, $3,825, not waiving, however, any of its rights under the draft on the Hibernia Society.

A stipulation has been entered into by the parties to this action, under which, if it shall be decided that either the Hibernia Savings and Loan Society or Golden is liable on the check, judgment shall go against Golden.

The trial court filed its findings of fact and conclusions of law, and caused judgment to be entered in favor of Golden and against plaintiff, from which judgment and an order denying plaintiff's motion for a new trial this appeal is prosecuted.

A witness for the plaintiff testified that it would not have accepted the Golden check for collection, and from other cir-

cumstances in the case it is clear that the plaintiff did not receive it merely for that purpose. Nor is it seriously claimed that the check was accepted by the plaintiff as a payment on account of Rowe's indebtedness. The worthless check on the Bank of Commerce was not turned over to Rowe or Golden; no entry in the books of the plaintiff, or act of its officers, indicates that it was so accepted. It was apparently taken by the plaintiff to be applied in reduction of Rowe's indebtedness when collected. Doubtless if this check had been paid, the amount thereof would have been indorsed on the instrument evidencing Rowe's indebtedness to the bank and treated as payment, but not otherwise.

This order on the Hibernia Society was not unconditional and free from any other contract. It follows that it was not negotiable. While upon its face it was payable upon demand, it was in fact not to be paid until thirty days' notice was given to the drawee, and its payment was also conditional upon its being accompanied by the drawer's pass-book. In view of these conditions—notice of which was brought home to the plaintiff—it cannot be held, as asserted by plaintiff, that the draft was negotiable. (Civ. Code, secs. 3087, 3088, 3090, 3093.)

In the case of *White* v. *Cushing,* 88 Me. 339, [51 Am. St. Rep. 402, 32 L. R. A. 590, 45 Atl. 164], the court, in passing upon the effect of an order containing the words, "The bankbook of the depositor must accompany this order," held that without these words the order was payable absolutely and was negotiable; that with those words it was payable only upon the condition of the production of the drawer's bank-book. "It must, therefore," says the court, "be held that the contingency embarrasses and obstructs the free circulation of the order for commercial purposes, rendering it not negotiable." (See, also, *Yeaton* v. *Bank of Alexandria,* 5 Cranch, 51, [3 L. Ed. 33]; *Davis* v. *Bank,* 118 Cal. 600, [50 Pac. 666]; *Union Ins. Co.* v. *American F. Ins. Co.,* 107 Cal. 327, [48 Am. St. Rep. 140, 28 L. R. A. 692, 40 Pac. 431]; *Auzerais* v. *Naglee,* 74 Cal. 60, [15 Pac. 371]; *Burns* v. *Sennett,* 99 Cal. 363, [33 Pac. 916]; *Hostetter* v. *Park,* 137 U. S. 30, [34 L. Ed. 568, 11 Sup. Ct. Rep. 1]; *Lillard* v. *Kentucky,* 134 Fed. 168, [67 C. C. A. 74]; *Mills* v. *Bank of United States,* 11 Wheat. 431, [6 L. Ed. 512]; *Bank of Washington* v. *Triplett,*

1 Pet. 25, [7 L. Ed. 37] ; *Iron City Nat. Bank* v. *McCord,* 139 Pa. 52, [23 Am. St. Rep. 166, 11 L. R. A. 559, 21 Atl. 143].)

It appears to us to be clear that the Golden draft was a non-negotiable chose in action; and that owing to the fraudulent representation of Rowe it was given by him without consideration as between him and Golden. We are also of the opinion that plaintiff took it with the equities charged against it in the hands of Rowe (Civ. Code, secs. 1083, 1459; *Wright* v. *Levy,* 12 Cal. 257; *Mohr* v. *Byrne,* 135 Cal. 87, [67 Pac. 11]), unless Golden, on some application of the principle of estoppel, is prevented from setting up those equities.

It is true that where one purchases in good faith and for value a chose in action, not negotiable, from one to whom the owner has transferred the apparent ownership, he obtains a valid title against such owner even though the person from whom he so obtained it had no title. In *Thompson* v. *Toland,* 48 Cal. 99, it was held that the owner of mining stock, who allowed his broker to hold the certificates therefor in his own name as security for the balance due thereon— nothing appearing on the face of the certificates to indicate that the real owner had any interest therein—would be estopped from asserting his title against a purchaser in good faith and without notice. "Under such circumstances," says the court at page 112, "the party who places another in a position to enable him to practice the fraud should suffer the loss rather than an innocent person who deals with him on the faith of the usual *indicia* of ownership with which the true owner has vested him."

But the circumstances of this case hardly bring it within the rule declared in those decisions. Here the plaintiff took without notice of the fraud perpetrated on Golden by Rowe; and notwithstanding the uncontradicted evidence of Golden to the contrary, the court found that the plaintiff had no actual notice that the payment by Golden was conditional. But we think that plaintiff parted with no value when it took the draft.

Appellant, however, contends to the contrary, and argues that by the mere receipt of the order drawn by Golden on the Hibernia Savings and Loan Society the appellant extended the time to pay Rowe's debt to it, and thereby parted with value and placed itself at a disadvantage. This conten-

tion is rested upon a long line of cases in this state holding that where a creditor receives upon an antecedent debt already matured the note of a debtor or of a third person, payable at a future date, although the debt is not thereby extinguished, the acceptance of the new obligation payable *in futuro* operates as an implied extension of the time of payment of the original debt.

"It extends the time for payment until the maturing of the new note, or, as it is said, 'suspends' the remedy upon the old note, but does not extinguish it." (*Tolman* v. *Smith,* 85 Cal. 280, 287, [24 Pac. 743, 745], and cases cited.)

But this rule applies only to that class of cases in which the new obligation is accepted by the creditor as conditional payment of the original debt, or in which the new obligation, "for the time being at least, is to take the place of and represent the original debt.   That class is distinguishable from, and not to be confounded with, the class where the creditor has accepted simply a new additional or collateral security for an antecedent debt.   In the former transaction an agreement to give time may be implied, but not out of the latter transaction." (*Austin* v. *Curtis,* 31 Vt. 64, 76.)

In the case just cited the authorities which make and illustrate the distinction between the two classes of cases are discussed at length.   The distinction, however, is apparent and based upon obvious grounds of difference.   If a creditor holds a note of his debtor which has already matured, and accepts in lieu thereof a new note payable a year later, it is plain that the new note is a substitution for the old obligation, and the reasonable implication from its acceptance is that the creditor has extended the time of payment of the debt.

If, on the other hand, without any idea of substituting it for the old debt or of treating it as a payment conditional or otherwise, until collected, a creditor accepts from his debtor the check or order of a third person, payable *in futuro,* or any instrument offered and received merely to further assure or secure payment of the debt, it would do violence to the intent of the parties to hold that by the acceptance of such additional security, the creditor has extended the primary debt, and cannot collect from his debtor until his security has matured.

A class of cases in which this distinction is frequently drawn is that in which a surety contends that he has been released by the extension of the debt without his consent. In those cases it is held that there is no extension of time to the principal to be implied "merely by the creditor taking a new security maturing after the debt becomes due, such as a mortgage, a guaranty, a warrant of attorney to confess judgment, or an order of a third person; nor is an extension effected by taking a bond or note of the principal as collateral security, or a note or bill of exchange of the principal for the purpose of having the proceeds thereof, when obtained, applied on the original indebtedness, although such action has been taken by the principal with the expectation that the creditor will refrain from pressing him for immediate payment." (32 Cyc. 211, and numerous cases cited.)

As already said, the facts of the present case show plainly that the order of Golden on the Hibernia Bank was not received by plaintiff from Rowe as in any way substitutional for the original debt, or as anything but additional security, the proceeds of which, when collected, were to be applied on the debt. No credit was allowed by the bank to Rowe at the time it received the order and pass-book of Golden. It intended to apply the money on the debt when collected, and not before. Collection of the order could not be enforced for thirty days, but not because any of the parties desired to postpone its payment for that time, nor because it was made in pursuance of any agreement for a thirty days' extension of time. The sole reason was that the savings bank had availed itself of the right to require thirty days' notice of withdrawals. Under these circumstances we do not think that from the mere receipt of the order any agreement to extend the time of payment can be implied, and we are of the opinion that no such extension resulted as a matter of law from the transaction.

Even, however, if it could be held that regardless of the intention of the parties such an extension resulted as a matter of law, we would, nevertheless, be inclined to hold that this would not suffice to show that plaintiff has suffered any prejudice which would entitle it to rely upon the rule protecting that one of two innocent parties who had suffered through the fraud of a third person clothed with the apparent ownership

by the other innocent party.   A similar question was presented
in *Ingenhuett* v. *Hunt,* 15 Tex. Civ. App. 248, [39 S. W. 310].
In that case Hunt owed the plaintiff a certain sum which was
overdue, and Hunt and his sister executed a note payable three
years after date for the amount of the debt.   To secure this
new note, the sister executed a mortgage on certain lands
which it was claimed by the intervenor was held by her as
trustee for him.   The court, after holding that the trust in
the land had been shown, next considered whether the plain-
tiff could be protected as a lienholder without notice, who had
parted with value.   After observing that the note extended
the time of payment for three years on its face, the court
conceded that ''where a mortgage is given to secure a past-due
indebtedness, and as a consideration entering into the transac-
tion the time of payment is extended, the lienholder is pro-
tected against unknown equities for the reason that he has,
by contract, parted with a valuable right.''   (Citing cases.)
The opinion, however, continues: ''An extension may not be
contracted for, and yet given.   According to the testimony of
S. P. Hunt and Mrs. Hunt, nothing was said about an exten-
sion, and the note and mortgage were signed as presented to
them by appellant's agent, and there was no other considera-
tion for the note and deed of trust than the past indebtedness,
and the sole purpose of the transaction was to secure appel-
lant's demand.   In other words, the fair inference from this
testimony is that the note and mortgage were executed with-
out reference to further time.   If this were so, we believe the
case would not come within the rule above expressed.   If,
without any arrangement or stipulation for that purpose, the
giving of time by drawing the note payable at three years
was the gratuitous act of the appellant, not induced or asked
by defendants, he could not say that he had, through contract,
suspended or surrendered his right to enforce payment of the
account.''

The facts of this case are even stronger.   Here the order
on its face was payable at once.   If collection could not be at
once enforced, it was not because any of the parties desired
to postpone its maturity, but because, under unusual circum-
stances, the Hibernia Savings and Loan Society had availed
itself of its right to require notice of withdrawals.   As in the
Texas case, therefore, the order was accepted ''without refer-

ence to further time,'' and under circumstances from which no agreement for the extension of time of the principal debt can be implied, or from which equity would raise an estoppel. It may well be that the practical effect of the transaction was to assure Rowe that the bank would not press him for an immediate payment, but this was not because of any agreement for extension, nor because the bank, by receiving the order, had ''suspended'' its remedy on his debt. ''If the new security is but additional and collateral to the old, I think it may well be said that the effect of taking the new security on time does not prove a promise to give time, but doubtless may furnish ground for an expected indulgence which the principal debtor is bound to treat as being at all times countermandable at the will of the creditor.'' (*Austin* v. *Curtis*, 31 Vt. 64.)

Indeed, in every case where a new source of payment is given to a creditor ''not in lieu of or suspension of the old notes, but in addition to them, as a further security,'' the debtor may reasonably expect not to be pressed for payment until the security is realized upon, but in such case he trusts ''not to any legal change in the rights and remedies of the plaintiffs on the old notes, but to such indulgence as creditors are likely to grant when they feel assured of ultimate payment.'' (*Dodson* v. *Taylor*, 56 N. J. L. 11, [28 Atl. 316].)

The evidence supports the findings and the findings, in turn, sustain the judgment. The judgment and order are therefore affirmed.

Hall, J., and Lennon, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 20, 1912.