[Civ. No. 439. Fourth Appellate District.—September 11, 1930.]

DOUGLAS FAIRBANKS, Plaintiff and Respondent, v. CRUMP IRRIGATION AND SUPPLY COMPANY, INC. (a Corporation), et al., Defendants and Respondents; SOUTH COAST STATE BANK (a Corporation), Defendant and Appellant.

200

Sloane & Sloane and Harrison G. Sloane for Appellant.

Rolland C. Springer for Plaintiff and Respondent.

Lawler & Degnan, Abrams & Sadicoff, George C. Mansfield, Arthur W. Kennedy, Culver & Nourse, Hoyne & Boehler, Honnold & Hubbell, Arthur F. H. Wright and G. C. Selleck for Defendants and Respondents.

HAINES, J., *pro tem.*—On August 22, 1927, the Crump Irrigation and Supply Company, Inc., hereinafter referred to as "the contractor," contracted in writing with plaintiff and respondent Douglas Fairbanks to perform and provide the labor and materials and carry out the work of constructing for Fairbanks on a ranch belonging to him in San Diego County an overhead horticultural sprinkling system, for the total contract price of $26,000, of which $5,000 was payable on the completion, according to the specifications, of the ditching, besides which, on the first day of each month while the work was in progress, the contractor was to be paid eighty-five per cent of the value of the material and labor furnished during the previous calendar month, as estimated by Fairbanks' engineer. The contract contained a clause to the effect that "party of the second part (the contractor) may assign any or all moneys due under this contract upon written consent of the party of the first part (Fairbanks)." The final payment embracing all sums due under the contract and not previously paid was to be made to the contractor within ten days from the date of completion of the work. The bond required of the contractor for faithful performance of the work in the amount of $13,000, being fifty per cent of the contract price, was furnished by defendant and respondent Hartford Accident and Indemnity Company, hereinafter referred to as "the

surety company," and dated August 20, 1927, and was, among other things, conditioned for the payment in full of the claims of all persons performing labor upon or furnishing materials to be used in said work and was made to inure to their benefit as well as that of Fairbanks. On September 13, 1927, the contractor assigned to defendant and appellant South Coast State Bank, hereinafter sometimes referred to as "appellant" or "appellant bank," the $5,000, which is mentioned in the assignment as "due from Douglas Fairbanks for ditching," though it was not yet due, as the ditching was not finished until October 15th. The contractor at the time owed the bank $5,000, and concurrently with taking the assignment the bank took from him a renewal note for the indebtedness, taking the assignment as collateral security for its payment. The assignment was on September 14th presented by the bank to one Smart, Fairbanks' ranch manager, who indorsed it with the words "Accepted this 14th day of Sept. 1927 Douglas Fairbanks by W. A. Smart." In November, 1927, according to the findings, the contractor became financially embarrassed and unable to complete the work and the surety company took charge and, as the court finds, carried it to completion, expending in paying laborers and materialmen $2,800, for which it has been repaid by Fairbanks, and $3,598.05, for which it has, thus far, received no reimbursement. The date of the actual completion was December 1, 1927. There is evidence in the record that the contractor's financial difficulties had sufficiently developed at an earlier date so that, on October 21, 1927, the surety company wrote Fairbanks (Ex. 11) that "because of the several assignments which have been made in connection with the contract and the garnishments served" he, Fairbanks, might feel some concern; that the surety company thought there was "more smoke than fire" and the contract would undoubtedly be completed without further delay, but that "we wish to ask that no further payments be made until our consent is first obtained." This letter proceeded further as follows:

"In addition to the reason set forth above for this request, allow me to call your attention to a provision contained in our contract with the Crump Irrigation and Supply Company.

" 'The undersigned further agree, as of this date, that the Surety shall, as surety on said bond, be subrogated to all their rights, privileges and properties as principal and otherwise in said contract, and they hereby assign, transfer and convey to the Surety all the deferred payments and retained percentages, and any and all moneys and properties that may be due and payable to the undersigned at the time of such breach or default or that thereafter may become due and payable to them on account of said contract, or on account of extra work or materials supplied in connection therewith, hereby agreeing that such money, and the proceeds of such payments and properties, shall be the sole property of the Surety, and to be by it credited upon any loss, cost, damage, charge and expense sustained or incurred by it as above under its said bond.'

"This clause is rendered operative at our pleasure, and we do not feel it necessary at this time to insist that this assignment be made effective. It does, however, establish our right to come in ahead of any other assignments which have been made."

On October 29, 1927, the surety company wrote Fairbanks, referring further to its said subrogation arrangement with the contractor, and undertaking to exercise what it claimed was its right thereunder of being subrogated, as of the date of the original contract, to the right to the whole contract price as it became payable. It does not appear that Fairbanks was ever advised of the subrogation contract until the surety company's letter of October 21st was received, nor that appellant bank ever heard of it prior to the commencement of this action. In fact, the evidence only rather incidentally shows its existence. It was not pleaded in the surety company's cross-complaint, and though mentioned in the findings preceding the interlocutory judgment as "an assignment or purported assignment" forming the basis of the surety company's claim, it is not referred to in the findings made on the final hearing at all.

Besides the work embraced in the original contract there were extras to the value of $3,259.02 installed in accordance with the permission contained in the contract which, added to the $26,000 contract price, brought the aggregate to $29,259.02, of which Fairbanks at the time this action was begun had paid $17,406.10, leaving unpaid and in his hands

on account of the contract and extras a balance of $11,852.92. There remained various unpaid claims of parties who furnished labor and materials for the work, for which the statutory notices of claims of liens were filed, the aggregate of which, as determined in detail by the court, amounts to $10,586.19, making, together with the $3,598.05 disbursed by the surety company and not repaid to it, a total of $14,184.24. In addition to this the Columbia Steel & Tube Company levied on October 10, 1927, a garnishment for a claim of $2,634.04, and appellant bank claims its $5,000 with interest under its assignment from the contractor, and, according to the findings, on or about December 1, 1927, made demand on Fairbanks for payment of the same. Actually the managing officer of appellant bank testified that he made "many oral demands, and then wrote a letter about the middle of October, sometime in October." These October demands, however, were made on Smart. Fairbanks paid $11,852.92, conceded to be due from him, into court, and filed on December 30, 1927, the present action, in the nature of a bill in interpleader against appellant bank and the surety company and other claimants, now respondents, asking that he be relieved of further responsibility to them, and that they be required to interplead to determine their respective rights to the $11,852.92. Numerous pleadings having been filed by the parties and the cause brought on for trial, findings were made and an interlocutory judgment entered on January 29, 1929, determining that Fairbanks, by depositing in court the said $11,852.92, became entitled to discharge from further responsibility to each and all of the other parties to the action, and giving him such discharge accordingly. The remaining parties were required to interplead with each other in respect of their several rights and claims in and to the money paid into court. The cause was further tried accordingly, and the court, by its findings and final judgment under date April 6, 1929, determined that Smart was without authority to accept or agree, on Fairbanks' behalf, to honor the contractor's assignment of its right to said $5,000 payment to appellant bank, and that the bank had no right to any part of the $11,852.92 deposited in court, and that the Columbia Steel & Tube Company's garnishment, levied before any payments were due, conferred on it no rights.

As to the rest of the claimants, including the surety company, following a stipulation to which some only of them were parties, the court held their claims to be all of equal rank and priority, and by its judgment directed that the $11,852.92, less Fairbanks' costs, be prorated among them to the exclusion of the Columbia Steel & Tube Company and the appellant bank.

The bank has appealed both from the interlocutory and from the final judgment by separate notices of appeal, but both appeals are, without apparent objection from any of the parties, presented here upon the same transcript.

Appellant claims, first, that plaintiff and respondent Fairbanks was not entitled, by bringing money into court, to any discharge of his liability to it, and, secondly, that the trial court erred in excluding it from participating in the moneys deposited in court and in not awarding to it, therefrom, the amount of its $5,000 claim in full.

The surety company and the claimants other than the Columbia Steel & Tube Company and appellant bank, are satisfied with both interlocutory and final judgments, save as some claimants may have objections which they have not presented on this appeal, to the surety company's participation with them *pro rata* in the distribution. The Columbia Steel & Tube Company has not appealed. Fairbanks is satisfied with the interlocutory judgment. If that is to stand, the final judgment does not concern him. Otherwise it does.

■ The contract, as we saw, provided that "any and all moneys due" might be assigned with Fairbanks' "written consent." Appellant rightly says that no such language was needed to make payments due assignable. But the language, having been used, must be given some effect, and it would have none unless it were tantamount to a provision that payments should *not* be assigned *until due,* and *not then without Fairbanks' written consent.* We are aware of no reason why the provision, as so construed should not be given effect.

Unless, therefore, Smart had the authority, actual or ostensible, to waive for Fairbanks the contractual restriction that payments be due before being assigned, and also to consent for Fairbanks to particular assignments, the assignment to appellant bank was evidently, as in any way

binding Fairbanks, ineffectual. There is no evidence that Smart had any express authority to do anything of the sort and there is evidence in the record that he had not. It is claimed, however, that he had implied authority to do so, none the less actual than as though expressed, and that even if he did not, he at least had such ostensible authority to do so, or, as appellants' counsel say is more strictly accurate, such "agency by estoppel" as was, for the purposes of the case, equivalent to actual authority. Smart testified that he consented, as Fairbanks' agent, to the assignment under which appellant bank claims. This statement was stricken out, because he further stated that he was the general manager of the Fairbanks ranch under a letter or written contract of employment which he agreed to produce, and that the authority which he claimed, to accept the assignment, was based on that writing. The writing was not in fact produced at all, since, as he afterward testified, he could not locate it. He stated, however, that it contained no authorization in terms to accept or consent to any assignments. The evidence shows that he signed Douglas Fairbanks' name by himself to the original contract under which the contractor was doing the work. This he first said that he did "presuming" his authority from the letter naming him manager of the ranch, though there was nothing in it about contracting for the irrigation system. Later he said that he signed the contract on oral instructions from Douglas Fairbanks' brother and agent, Robert Fairbanks, but that at the time he accepted the assignment to the bank he had had no talk either with Douglas or Robert Fairbanks about doing so. The evidence showed that Smart had general charge of operating the Fairbanks ranch and of employing and directing the men engaged in working it; that there was with appellant bank a small Fairbanks account not exceeding about $2,000 on which Smart was accustomed to draw checks to pay the ranch hands and which he from time to time replenished by remittances obtained by him from the Los Angeles office. Smart testified that when any large expenditures were required he obtained his directions either from Robert Fairbanks or from one Ericksen, Douglas Fairbanks' financial manager at Los Angeles, before making them. It does not appear that appellant bank knew that.

Smart had nothing actually to do with making the progress payments that were made under the contract. These were made by Ericksen from Los Angeles. From Ericksen's files was produced a letter (Ex. 5) from the contractor, addressed to Fairbanks, dated August 22, 1927, in which, referring to payments to fall due under the contract, appears the following: "In making these payments, kindly make all checks except the check for $5,000.00 covering the ditching in favor of the Crump Irrigation & Supply Company and the Pacific Pipe & Supply Company jointly." This was indorsed:

"This will acknowledge receipt of your request regarding payments and checks when due will be prepared accordingly.

"W. A. SMART."

It does not appear that either this letter or the indorsement on it were ever communicated to appellant bank. Both were made long before the assignment under which it claims was executed and neither is shown to have any connection with that.

The evidence shows that a letter (Ex. B) from the contractor to Fairbanks of even date with the assignment (September 13, 1927), mentioning the assignment and inclosing a copy of it, found its way to Smart's files. On the face of the letter it is addressed to Douglas Fairbanks at Los Angeles. Smart testified that it came to him through the mail, but he did not remember whence. This leaves it uncertain whether it was mailed by the contractor to Fairbanks at Los Angeles and by him remailed to Smart, or mailed by the contractor to Smart in the first instance. Smart testified that the "letter and assignment" (by which, as we suppose, the inclosed copy of the assignment is meant) did not remain in his possession down to the date on which he was being examined as a witness but that he believed he either sent them "to Mr. Springer (Fairbanks' attorney of record in this case residing at San Diego) or to the Los Angeles office." According to Mr. Springer he, Springer, had prior to October 18, 1927, though it does not appear how long before, been employed by Robert Fairbanks, agent for Douglas Fairbanks, to act for the latter in and about the matter of this contract and the payments due under it, and the original assignment to appellant bank

208

was presented to him for examination about October 17th. He says, also, that he has in his file the said letter of September 13th, with the copy of the assignment, but does not recollect when he got them.

Reference has already been made in this opinion to the mention by the surety company in its letter to Fairbanks of October 21, 1927, of "assignments made" in connection with the contract.

There was also produced as part of Fairbanks' evidence, and apparently from Ericksen's files, a statement of the contractor dated October 22, 1927, known as exhibit 12, approved by Smart, reading as follows:

"Estimate No. 3.

"To payment due upon completion of ditching work on overhead irrigation system, Unit No. 3, in accordance with contract ..................................... $5000.00. In accordance with assignment on file this check to be made payable to South Coast State Bank, Solana Beach, Calif.

"O.K.—W. A. SMART."

It does not appear either that this statement of Smart's approval of it was ever communicated to appellant bank.

■ It seems to us, so far as the question of actual authority in Smart to consent to the assignment was concerned, an authority admittedly not expressed but, as is claimed, implied from the situation, that there was in the circumstance that the handling of the payments under the contract was retained in the Los Angeles office, and in the further circumstance, that he was, in his general management of the ranch, not authorized to make large disbursements except on consultation with Robert Fairbanks or Ericksen, evidence to support the trial court's finding that no such implied authority existed. So far forth, then, as against an attack on the judgment of the trial court, we are bound by the finding. (*Tupman* v. *Haberkern*, 208 Cal. 256 [280 Pac. 970].)

The next question is whether Smart had the ostensible authority, or, as appellants' counsel prefers to put it, an "agency by estoppel" to consent to the assignment. It cannot be gainsaid that he was allowed to sign Fairbanks' name by himself to the contract and that the instrument has since been recognized and acted upon by all parties as valid and binding. Out of it arose the claim to the

$5,000 to which appellant seeks to establish its rights as assignee. Appellant, over some considerable period of time, did business with Smart as manager of the ranch, and it was through appellant that Smart, with at least the acquiescence of Fairbanks, handled the pay-rolls for routine ranch work. None of these facts are disputed at all. There is no sort of question that Smart was Fairbanks' agent. It is a question merely what, in the circumstances, appellant bank had the right to believe was the scope of his agency.

It is said in section 2317 of the Civil Code that ''ostensible agency is such as a principal intentionally or by want of ordinary care causes or allows a third person to believe the agent to possess.'' It has been laid down that, where the agency is general, third persons are not bound by limitations placed by the principal on the agent's authority, but which are unknown to them (*Thomas* v. *Fursman*, 39 Cal. App. 278, 284 [178 Pac. 870]), yet that where it is special those who deal with the agent must inquire into its limits. (*Blum* v. *Robertson*, 24 Cal. 127.) Still, with regard to either general or special agents, ''the question of the authority of the agent must depend, so far as it involves the rights of innocent third persons who have relied thereon in good faith, upon the character bestowed and not upon the instructions given. Or in other words, the principal is bound to third persons who have relied thereon in good faith, and in ignorane of any limitations or restrictions, by the apparent authority he has given to the agent, and not by the actual or express authority, where that differs from the apparent, and this, too, whether the agency be a general or a special one.'' (*Whitton* v. *Sullivan*, 96 Cal. 480, 483 [31 Pac. 1115].) Decisions to the effect that a third person in dealing with an agent must at his peril inquire into the agent's authority have no application where, by reason of the conduct of the principal there is apparently no reason for inquiry. (*Robinson* v. *American Fish Co.*, 17 Cal. App. 212, 219, 220 [119 Pac. 388].) In *Hicks* v. *Wilson*, 197 Cal. 269, 274 [240 Pac. 289], where the owner of land had instructed the purchaser to do business with a broker who had no actual authority to receive the purchase money, it was held that the purchaser had a right to rely on the instructions given him to the extent of pay-

ing money on account of the purchase price to the broker. The court said (p. 274) that it was well settled "that a principal is bound not only by the acts which he has actually authorized an agent to perform, but also by those which he has allowed third persons to believe him to be authorized to do" and (p. 276) that the owner, by holding out the broker as his agent for the consummation of the sale and expressly authorizing the purchasers to do business with him, "is estopped to deny that he had authority to represent him as agent in all steps necessary to be taken in that matter, including the receipt of the portion of the purchase price in question." A case somewhat analogous to the one before us was *Hoskins* v. *Swain*, 61 Cal. 338, where an absent plaintiff had empowered a foreman to act as general superintendent and manager of a foundry. The superintendent had been accustomed to buy materials for the foundry, employ workmen, sell goods, collect accounts and disburse moneys in paying bills against the foundry. He borrowed certain money for the use of the foundry and, after the delivery of certain foundry products to a purchaser, assigned the accounts against such purchaser as security to the lender of the money, who proceeded to collect the same from the purchaser. It was held that in the circumstances the owner of the foundry could not question the right of the superintendent to make the assignment, since the acts done were acts which would fall within his ostensible authority as one entrusted with conducting the foundry business. ▮ It seems to us that the situation here, there being, as we noticed, no real conflict in the evidence about Smart's actual position or what he appeared to the public to be doing, is not so much one which calls for inferences as to what his apparent authority was, as one which calls for a determination of the legal effect of the facts shown. In other words, the question of Smart's ostensible authority under the evidence is not one of law. True, Smart did not actually disburse the moneys paid out on Fairbanks' behalf under the contract. It does not appear, indeed, that appellant knew who was disbursing them. But Smart did seem to be empowered to contract as he liked, and the contract that he made, so far as was apparent to the public, at his own discretion, has been and is recognized by Fairbanks and everybody acting under

him, and upon that fact, coupled with Smart's general management of the ranch and payment of the ordinary bills connected therewith through appellant bank, it seems to us that the bank had, in the circumstances, the right to rely, to the extent of believing that, in undertaking to act for Fairbanks under the contract, Smart had the same actual authority that he had to sign it. ■ In 2 C. J. 464, it is, in speaking of ostensible agency, said that the general rule "embraces three primary elements. These are: (1) A representation by the principal, (2) a reliance upon such representation by a third person, and (3) a change of position by such third person in reliance upon such representation." As to the first element, we have just seen that under the provisions of our code the representation may as well arise from a want of ordinary care on the part of the principal as from intention. ■ As to the second, there is no question that, in the instant case, appellant bank, when it took Smart's acceptance of the assignment without going to Fairbanks or some of his more immediate representatives for confirmation of the same, relied upon the situation which Smart seemed to occupy, and· what he had been allowed by Fairbanks to do. As to the third, there can be no question that appellant changed its position in reliance on the same situation. Counsel for the surety company contend, indeed, that it did not, relying on *First Nat. Bank* v. *Golden,* 19 Cal. App. 501 [126 Pac. 498]. That case does not sustain their contention. On the contrary, the court there recognizes (p. 507) that there is "a long line of cases in this state holding that where a creditor receives upon an antecedent debt already matured the note of a debtor . . . payable at a future date, although the debt is not thereby extinguished, the acceptance of the new obligation payable *in futuro* operates as an implied extension of the time of payment of the original debt." *Tolman* v. *Smith,* 85 Cal. 280, 287 [24 Pac. 743, 745], is quoted to the effect that "It extends the time for payment until the maturity of the new note, or, as it is said 'suspends' the remedy upon the old note, but does not extinguish it." It is true that the court in the Golden case goes on to say:

"This rule. applies only to that class of cases in which the new obligation is accepted by the creditor as conditional payment of the original debt, ·or in which the new

obligation 'for the time being at least, is to take the place of and represent the original debt. That class is distinguishable from, and not to be confounded with, the class where the creditor has accepted simply a new additional or collateral security for an antecedent debt. In the former transaction an agreement to give time may be implied, but not out of the latter transaction.' " (Citing *Austin* v. *Curtis*, 31 Vt. 64, 76.)

Even so, however, the case at bar comes precisely within the class of cases where the time for the payment of the debt is extended and the creditor's position thereby changed. The change is not only presumptively a detriment to the creditor, but, in this case, affirmatively appears to have been one, since after receiving the extension the debtor became so financially embarrassed that he abandoned the work. Besides, the Supreme Court has repeatedly held "that not only does an antecedent indebtedness constitute a valuable consideration for a transfer in satisfaction and discharge of said indebtedness, but it is also a valuable consideration within the protection of the equitable doctrine of *bona fide* purchase for a transfer merely as security for a preexisting debt." (*Smitton* v. *McCullough*, 182 Cal. 530, 537 [189 Pac. 686, 689], and cases cited.)

In fine, we think that all the requisite circumstances here concur to estop Fairbanks to deny that Smart was authorized to consent to the assignment to appellant bank.

There is, of course, in addition to all questions of estoppel and ostensible agency, the further question of a ratification by Fairbanks of Smart's consent to the assignment claimed to result both from the situation, as we have recited it, and also from the position assumed in his behalf in the pleadings and at the trial, which was, in effect, that he was at that stage making no objection to Smart's action as a *consent* to the assignment, but did repudiate it as any such *acceptance* of the assignment as would bind him to liability to recognize it, otherwise than as a charge on the contract price. Undoubtedly, as said in *Ralphs* v. *Hensler*, 97 Cal. 296, 302 [32 Pac. 243, 245], "Where an authorized agent transcends his authority, the liability of the principal to be held to have ratified the unauthorized acts by mere acquiescence is much greater than it would be in case an utter stranger had assumed to act as agent without any

authority for any purpose whatever, because in general, where an agent is authorized to do an act and he transcends his authority it is the duty of the principal to repudiate the act as soon as he is fully informed of what has been thus done in his name, else he will be bound by the act as having ratified it by implication.'' The situation, however, and particularly the showing as to precisely when Fairbanks' Los Angeles representatives received notice that Smart had undertaken to approve the assignment, is too equivocal to justify us in placing our decision that it must be treated as consented to on the theory of a ratification, although the circumstances strongly indicate that as a probability. We prefer to rest our decision as respects this phase of the case, simply on the ground that Smart's ostensible authority, at the time he undertook to annex Fairbanks' consent to the assignment, was such that the consent must be treated as though authorized when made.

■ We have next to consider, then, the effect of the assignment, treating it as though it had been presented to Fairbanks and consented to by him on September 14, 1927. It was not subject to the subrogation arrangement between the contractor and the surety company even though such arrangement existed, because that arrangement was not brought to Fairbanks' notice until the surety company's letter of October 21st was received (whenever that may have been) and the conclusions which we have just reached charge him with notice of the assignment to the bank as of September 14th, and it is the law that, as between conflicting assignments, by an obligee of funds payable by an obligor, that which is first brought to the obligor's attention has the priority. (*Graham Paper Co.* v. *Pembroke,* 124 Cal. 117, 120 [71 Am. St. Rep. 26, 44 L. R. A. 632, 56 Pac. 627]; *Widenmann* v. *Weniger,* 164 Cal. 667, 672, 673 [130 Pac. 421].) The truth is that this subrogation agreement has been treated in the present litigation from start to finish as unimportant, and, we think, rightly so. Reverting, then, to the assignment to the bank, we do not think that its effect is even doubtful. It transferred to appellant bank the right to receive from Fairbanks the $5,000, out of the contract price for the work, subject to no other condition precedent than that the right to such $5,000 should mature by the contractor's completion, while not

otherwise in default to Fairbanks under the contract, of the ditching, on the completion of which it was to fall due. This the contractor did before suffering any actual default. It is indeed claimed, on behalf of the lienholders and the surety company respectively, that the lienholders as of the date when work commenced under the contract (*Simons Brick Co.* v. *Hetzel*, 72 Cal. App. 1 [236 Pac. 357]), and the surety company as of the date when it executed its bond (*Wasco County* v. *New Equitable Ins. Co.*, 88 Or. 565 [Ann. Cas. 1918E, 656, L. R. A. 1918D, 732, 172 Pac. 126]), acquired vested rights which could not be divested by the subsequent assignment to appellant bank. Our attention is especially called to the following language in the Simons Brick Co. case (p. 7):

"All liens for labor done or materials furnished for the building primarily rest upon this contract and derive their validity therefrom."

It is also said in that case that "the liens of such persons originating under and depending for their validity upon the original contract would date back to the time of commencement of work upon the building." We are required, however, to look to the nature and the limits of the rights with which either lienholders or surety company can be held to have been thus invested.

"The general constitutional principle which has always underlaid the mechanic's lien law of California is that the liability to liens upon the property of an owner who on his part has exactly complied with a valid building contract is limited by the price stipulated for in that contract. This means not only that the aggregate amount of liens cannot exceed the contract price but that payments made in good faith to the contractor in accordance with the terms of the contract before notices of lien are filed or stop notices given are a *pro tanto* discharge to the owner from liability." (17 Cal. Jur., pp. 43, 44, and cases cited.)

It is said, therefore, that "the unpaid balance of such contract price is a fund set apart for the satisfaction of lien claimants," and the lien on the property is a charge to secure its payment. (*Stockton Lbr. Co.* v. *Schuler*, 155 Cal. 411, 413 [101 Pac. 307, 308].) The restriction, however, which prior to the legislation of 1911 appeared in section 1184 of the Code of Civil Procedure upon the pro-

visions of building contracts in respect to the terms and times of payments made to apply on the contract price, including the requirement that the final payment of at least twenty-five per cent be reserved until the lapse of thirty-five days after the completion of the work, were repealed in that year, as was also the provision that no payment made prior to the time when due should be valid for the purpose of defeating, diminishing or discharging any lien except the contractor's, but should be deemed as if not made and should be applicable to such liens, though the contractor should afterward abandon his contract or become liable in damages to the owner. Whether, since these statutory provisions were repealed, any owner may, without jeopardizing *pro tanto* his immunity from liens, and in the absence of stop notices, pay to the contractor all or any part of the contract price before, under the terms of the contract, it falls due, we need not here determine. ▮ It is at least sure that there is no longer any restriction about what the contract may provide as to when payment shall be due. Certainly there can be no claim that it was not competent for Fairbanks to contract here that the $5,000 should be due when the ditching was completed. Indeed, he might lawfully have agreed to pay the whole contract price in advance. (*Roystone Co.* v. *Darling,* 171 Cal. 526, 534 [154 Pac. 15].) ▮ Having held the effect of the assignment to have been the same as though he had personally consented to it on September 14th, we must, as it seems to us, hold that the situation, so far as the lienholders and the surety company are concerned, had by the middle of October, become the same as though the assignment had been consented to and payment been made on the day the ditching was finished and while the contractor was still in good standing, since no default prior to the completion of the ditching in fact occurred. ▮ It is true that, both before and since the legislation of 1911, statutory provision for stop notices has in some form existed, and that therefore no assignment made by the contractor of an amount to become afterward due to him in the course of his performance of the contract can, before the arrival of the time for payment, where no payment has been actually made, defeat the rights of laborers and materialmen to give the stop notices and obtain the benefit thereof. (*First Nat.*

*Bank* v. *Perris Irr. Dist.*, 107 Cal. 55, 61 [40 Pac. 45] ; *Southern Cal. Elec. Co.* v. *McDonald*, 178 Cal. 386 [173 Pac. 760].) But, both before and since the changes in the statute, if the contractor has assigned an installment, such assignment is good against a subsequent stop notice served after the maturity thereof, and if a creditor of the contractor has garnished such installment, a subsequent ·stop notice served after maturity is subject to the rights of the attaching creditor. (*Southern Cal. Elec. Co.* v. *McDonald, supra,* at page 390, citing to that effect *First Nat. Bank* v. *Perris Irr. Dist., supra; Newport Wharf etc. Co.* v. *Drew,* 125 Cal. 585 [58 Pac. 187] ; *Niles* v. *Ryan,* 172 Cal. 205 [157 Pac. 5].) As is said in *Southern Cal. Elec. Co.* v. *McDonald, supra,* p. 390:

"The principle is, that if the laborer or materialman postpones the service of stop notice until after an installment matures, he can reach only such interest as the contractor then has in that instalment, and that he must take it subject to all previously acquired rights of third persons."

▪ Whatever legitimate objections, then, either surety company or those furnishing labor or materials might have made, had the $5,000 been paid to appellant bank before it fell due, automatically lost their force as soon as, without intervening default on the contractor's part or service of stop notices, payment actually became due.

If, then, on the completion of the ditching, on October 15th, the contractor, not being as yet in default with him, had demanded the $5,000, obviously Fairbanks would have had no lawful ground for refusing to pay it. Had he then paid it to the contractor, no stop notices having been served, he would have been charged with no responsibility for its application. Doubtless, had the assignment not been made, and the $5,000 not been in fact paid to the contractor when due, and had the contractor subsequently defaulted and abandoned its job, Fairbanks would have been relieved of any obligation thereafter to make to it that or any other payment on the contract price until there had been deducted therefrom the cost of finishing the work contracted for, but that would have been because the contractor was personally obligated to see the work done. But here the original assignment had been made, with what we have held tantamount to Fairbanks' consent, to appel-

lant bank, which owed Fairbanks no duty at all. The bank's right to collect the $5,000 for application on the contractor's indebtedness to it until that should be satisfied, was perfected with the completion of the ditching on October 15th, and the circumstance that the money was not actually paid over did not, as it seems to us, prevent its being effectively separated from the "unpaid" part of the contract price, so far as such unpaid price constituted a fund wherein either laborers, materialmen or the surety company had any interest. True, if before actually collecting the $5,000 under the assignment the bank had received satisfaction of any part of the contractor's debt to it, then as to any portion of the assigned payment no longer required to satisfy its own demands, it would be but the trustee for the contractor, and its right to make the collection would be subject to whatever offsets Fairbanks might then have against the contractor, and whatever it had thus ceased to have the right to collect should be treated in equity as returned to the fund, whence prior to the contractor's default it had been constructively separated as in effect "paid." But there is no proof in the record here that any part of the contractor's debt to the bank has been paid, though there was some claim by counsel at the trial that such was the fact.

The lienholders and the surety company particularly urge on our attention the case of *Roberts* v. *Spires*, 195 Cal. 267 [37 A. L. R. 763, 232 Pac. 708], decided in 1925, in which, continuing to follow the doctrine laid down under the law as it stood prior to the legislation of 1911 in *Stockton Lbr. Co.* v. *Schuler, supra,* that the *unpaid* balance of the contract price constitutes a fund which is set apart for the satisfaction of lien claimants, for which the lien on the land is mere security, it was held when there was no provision in a building contract permitting the owner to deduct damages for the contractor's delay in completing the building, or which in anywise imputed notice to laborers or materialmen that the contract price might be so diminished; that such owner could not, as against lien claimants, offset a claim against the contractor for damages resulting from delay in completing the building against the *unpaid* balance of the contract price. The whole basis of the decision, however, seems to be the right of those furnishing labor and materials to rely on the terms of the contract as written,

for it is said that "the owner might well have protected herself against the failure of the contractor to complete the work on time by the insertion of the requisite stipulations in the contract," and the intimation is plain that had she done so she would have been entitled to the deduction for her damages. This intimation is noticed, relied on and laid down as the law in *Bowman* v. *Maryland Casualty Co.*, 88 Cal. App. 481, 487, 488 [263 Pac. 826].

Our attention is called to *Castro* v. *Malcolm*, 66 Cal. App. 635 [226 Pac. 976, 979], as holding that the unpaid part of the contract price must, upon a contractor's default, be appropriated to the cost of finishing the work and reimbursing a surety company which, pursuant to its obligation to the owner, has finished the work and become subrogated to the owner's rights, as against an assignee of the contractor who has merely advanced moneys that have gone into the contractor's general account and are not traceable into the work. That case involved a contract let by a county providing for progress payments of seventy-five per cent of the estimated value of the work and the retention by the county of twenty-five per cent until thirty-five days after final completion, in addition to which it was provided that should the contractor leave work undone the county might complete it and that the expense of so doing should be "deducted and paid by the county out of any moneys then due or to become due to the contractor under the contract or any part thereof." But the situation there differed from that in the case at bar in that (1) the contractor's assignee did not at the time of taking the assignment change its position in reliance on it, and in that (2), as the court said, "by the very terms" of a section of the contract, "the county . . . was given the right to use all the moneys due the contractor under any circumstances and was not limited to the 25 per cent specified to be retained by the county in other portions of the contract." As we just saw, owner and contractor may, as between themselves, contract as they like, and obviously an assignee of the contractor is bound, in taking an assignment of anything due thereunder, to know whether by the terms of the contract it is otherwise appropriated.

Doubtless, also, when statutes require, as did section 1184 of the Code of Civil Procedure, prior to the legislation of

1911, that payments be made in installments limited in the proportion they may bear to the value of the work done, or that some proportion of the contract price be withheld until a certain time after the completion of the work, effect will be given to such enactments, as indicated in various authorities cited in *Castro* v. *Malcolm, supra,* as intending to make of the reserved payments a fund which equity will devote primarily to payment for labor and materials used in the work contracted for. But we are not, in the case at bar, dealing with such a statute. Here a contract expressly provided that the $5,000 should be due when the ditching was finished, and neither statute nor contract gave it any specific applicability to the payment for materials or labor, either theretofore or thereafter integrated into the work. Whatever right Fairbanks could afterward have to withhold it from the contractor could result only from some counterclaim or set-off arising against the contractor and in his favor, and unless something of the sort arose either before the payment became due or else before the contractor had validly assigned its right to it to appellant, we cannot see how the latter can be lawfully deprived of it. It seems to us that in this case the principles laid down in *Roystone* v. *Darling, supra,* and their necessary implications, are controlling, and that neither *Stockton Lumber Co.* v. *Schuler, supra,* *Roberts* v. *Spires, supra,* nor *Castro* v. *Malcolm, supra,* in any way militate against that conclusion.

It follows that appellant bank is entitled to have its $5,000 with interest at seven per cent per annum from December 1, 1927, when, according to the findings, its demand for the same was definitely refused, paid to it from the $11,852.92 deposited in court, as a claim having priority over the other claims here involved, except to the extent, if at all, that evidence to be produced before the trial court may show that the obligation of the contractor to it has been otherwise satisfied. The respective rights, as between themselves, of the surety company and the claimants under material and labor liens, have not been argued and we, therefore, express no opinion thereon.

Since the disposition which we make of the case renders it unnecessary to inquire whether, were appellant bank not entitled to the amount of its claim from the $11,852.92 deposited in court, Fairbanks would be personally liable to

it for its $5,000, we are not called on to decide that question and therefore, as no other complaint has been made of the interlocutory judgment, the same is affirmed. The final judgment is reversed and the cause remanded to the court below for further proceedings with respect to the claims involved therein not inconsistent with this opinion.

Cary, P. J., and Barnard, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 7, 1930, and the following opinion then rendered therein:

THE COURT.— In the surety company's petition for the rehearing of this case it is claimed that our opinion overlooks the failure of appellant bank to establish that no part of the contractor's indebtedness to it has been repaid to it. That matter was in fact expressly dealt with and in reversing the judgment we distinctly left it to the trial court to hereafter ascertain the facts in that behalf to the end that appellant should have credit from the fund assigned to it only for an amount equivalent to whatever remains unpaid on the contractor's obligation to it with the interest thereon. The surety company's real point is not so much that the matter was overlooked as that appellant bank was not required to prove a negative, namely that the obligation to it had not been paid. No such burden rested on it. (*Light* v. *Stevens*, 159 Cal. 288, 292 [113 Pac. 659] ; *Levey* v. *Henderson*, 177 Cal. 21, 23 [169 Pac. 673].)

 It is also claimed that we assumed without evidence that the maturity of the contractor's obligation to appellant bank was extended by the taking of a new note for it coincidently with the taking on September 13, 1927, of the collateral to secure the obligation and that we have also erroneously assumed that the original indebtedness was paid by the taking of the renewal note, and that it is on the basis of these assumptions that we have held that appellant bank changed its position to its detriment when it took the assignment. That there was on the part of the bank a forbearance to press for payment of the contractor's obligation to it following its receipt of the collateral, is, of course, unquestionable. True, such forbearance alone will not amount to such a change in a creditor's position to its

detriment as to raise an estoppel.. It is, of course, otherwise when there is a promise to forbear, and that may be implied as well as express, and, as pointed out in our original opinion, it will be implied when a new note payable *in futuro* is taken for the original obligation. The surety company claims that there is no evidence in this case that the new note was payable *in futuro,* and that it may be a mere demand note. Though the record is bare of any such suggestion the evidence does not exclude that as a possibility. Regardless of that phase of the. matter, however, the portion of the record printed in the supplement to the surety company's petition for rehearing includes, *inter alia,* the following (p. 10) from the testimony by the managing officer of appellant bank:

"We would loan them (i. e., loan the contractor) on an assignment, and when that assignment was paid off we would take another assignment; kept the fund revolving. . . .

"They (i. e., the contractor) paid off probably some assignment, and then a new assignment was made, and a new note made. *Any old indebtedness was paid off at that time and a new note was made.*"

In the light of this testimony it cannot successfully be claimed that the evidence is insufficient to show that when the present collateral was taken the position of appellant bank was changed to its detriment (*King* v. *Mellon Nat. Bank,* 227 Pa. 22 [75 Atl. 832] ; *Crawford* v. *Dollar Sav. F. & T. Co.,* 236 Pa. 206 [84 Atl. 694]).

Up to this point we have, in discussing the petitions for rehearing, done so on the basis which would apply were it necessary for appellant bank in order successfully to rely on an ostensible agency, to make out a strict case of agency by estoppel, that is to show the presence of each of the elements referred to in the passage from 2 C. J. 464, quoted in our original opinion. We adhere to the view that the showing made was sufficient for that purpose.

In view, however, of the doctrine laid down in *Smitton* v. *McCullough,* 182 Cal. 530 [189 Pac. 686, 689], we are not prepared to hold that appellant bank was under any obligation to go so far as that, because it is there held, as noted in our original opinion, "that not only does an antecedent indebtedness constitute a valuable consideration for a transfer in satisfaction and discharge of said indebtedness, *but it is also a valuable consideration, within the pro-*.

*tection of the equitable doctrine of bona fide purchase, for a transfer merely as security for a preexisting debt.''* In commenting on our reference to that opinion counsel for the surety company assume that we gave significance only to the earlier part of the language quoted. It is necessary, however, to give effect to the rule embodied in the part of the quotation above italicized. We have recently had occasion to comment on this same language in *Schumann-Heink & Co., Inc.*, v. *United States Nat. Bank, post,* p. 223 [291 Pac. 684], as well as in our opinion denying a rehearing in that case.

The point is made that we did not in our original opinion notice the contention that the pleadings of appellant bank, in effect at least, alleged an *actual* agency in Smart to accept in Fairbanks' behalf the assignment from the contractor to the bank, whereas our decision sustains the position of the bank on the basis of an ostensible agency not pleaded as such. But, as pointed out by counsel for the bank in his brief, even if his pleading could be construed as alleging an actual agency, proof of an ostensible agency could not amount to a variance. (*Donnelly* v. *San Francisco Bridge Co.*, 117 Cal. 417, 421, 422 [49 Pac. 559].)

A considerable part of the surety company's petition for rehearing is devoted to the claim that we failed to pass on its assertion of the right to be subrogated to the right of the owner under the doctrine of *Castro* v. *Malcolm*, 66 Cal. App. 635 [226 Pac. 976], and the cases therein relied upon. So far as the controversy between the surety company and appellant bank is concerned, that matter was expressly and necessarily passed on to the extent of holding that neither the owner nor the surety company have any right to deprive the appellant bank of the $5,000 covered by the assignment, in so far as the indebtedness from the contractor to the bank, for which that assignment was made security, may remain unpaid. To these views we adhere. We declined on the present appeal to pass on the respective rights, as between themselves, of the surety company and the claimants under material and labor liens, saying that their rights as between themselves had not been argued. To this we might have added that such a discussion would hardly be relevant to the present appeal, which is one by the bank to gain relief from a judgment against it. The surety company now asserts that all these matters were

in fact argued. What it means is that they were necessarily implicated in its claim to be subrogated to Fairbanks' rights under the doctrine of *Castro* v. *Malcolm, supra,* and it apparently asks us to hold at this time, despite its joinder with such of the claimants of material and labor liens as were represented at the trial, in a stipulation that they should be paid *pro rata* with it, that because the other lien claimants, who did not appear at the trial, did not join in the stipulation, therefore, it binds nobody, and that, by reason of the surety company's subrogation to the rights of Fairbanks, it must now be allowed its claim in full, from whatever is left if the bank is to be paid, to the exclusion of the material and labor lien claimants. It would be grossly unfair to the latter, who have had no reason to suppose any such question involved in the present appeal and have not discussed it before us to undertake to decide any such questions at this time. Their initial solution must be left to the trial court in its further hearing of this case and it will be time enough for us to deal with them when they are properly before us.

The petitions for rehearing are each denied.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 10, 1930.