[Civ. No. 30873. Fourth Dist., Div. Three. May 31, 1985.]

C. KENNETH HAMILTON, Cross-complainant and Appellant, v. THELMA R. DIXON, Cross-complainant and Respondent.

COUNSEL

Louis M. Niven for Cross-complainant and Appellant.

Nisson & Nisson and C. Arthur Nisson for Cross-complainant and Respondent.

OPINION

**CROSBY, J.**—This case presents a clash between the contractual right of a landlord to arbitrarily withhold consent to a sublease of commercial premises and the emerging concept of the implied covenant of good faith and fair dealing. In the case of this 15-year-old lease, we decline to apply a legal theory the parties could hardly have anticipated at the time the agreement was executed.

I

Thelma Dixon and her now-deceased husband entered into a long-term commercial lease with C. Kenneth Hamilton commencing May 1, 1970, and terminating January 1, 1994. The lease document was a preprinted Wolcotts form and provided for a monthly rental of $375 for the entire term. Hamilton was to pay all utilities, but the Dixons were responsible for the first $250 in annual property taxes. Hamilton agreed not to sublease without the Dixons' written consent. He borrowed $16,000 from them, secured by the lease, to make improvements on the property.

In 1974 Hamilton sold the automotive repair business he operated on the premises to Donald J. Wolf for $65,000. With Dixon's consent, Hamilton subleased the premises to Wolf for the balance of the master lease term. Wolf paid Hamilton $750 a month for the first five years of the sublease, and in 1979 the rent increased to $1,500 per month.

In early 1982, Wolf sold the business to Jong Kap Park and Ki Jha Park. The closing of escrow was contingent upon the execution of a valid sublease

between the Parks and master lessee Hamilton. The Parks and Hamilton negotiated a sublease on March 12, 1982. Rent was $1,500 per month for 1982, with an annual increase of $150 per month each succeeding year. The Parks took possession in March; and escrow on the sale of the business closed April 6, 1982, despite the lack of a written consent to the Hamilton-Park sublease from Dixon.

Hamilton testified he obtained Dixon's oral consent to the sublease on March 12, along with a promise to give written consent the following week, and executed the sublease in reliance on her representations. Dixon acknowledged speaking with Hamilton on March 12, but said he simply advised the premises were already subleased to the Parks and she would " 'have to give a written consent.' " The following week she met with Hamilton and told him she would not consent unless he renegotiated the rent on the master lease. He refused; so did she.

On April 12, 1982, Dixon unilaterally terminated the master lease based on Hamilton's breach in subleasing the premises without her consent. She served a "Notice of Default, Demand for Possession, and Election to Declare Forfeiture and Termination of Lease" on the Parks and Hamilton. The Parks responded with a complaint in interpleader and deposited the next twelve months' rent with the clerk of the municipal court.

Dixon answered the Park complaint in interpleader and filed a cross-complaint in unlawful detainer. Hamilton answered and cross-complained against Dixon for bad faith breach of contract and intentional interference with the Hamilton-Park contract relationship. The latter cause of action was based in part on Dixon's negotiation of a new master lease with the Parks on substantially the same terms as the Hamilton-Park sublease.

The case was transferred to the superior court on Hamilton's motion and tried without a jury. The court awarded possession to Dixon, finding Hamilton materially breached the lease by failing to secure Dixon's written consent to the sublease, thus justifying the landlord's unilateral termination. The court found Dixon did not tortiously interfere with Hamilton's contractual relations. The clerk was ordered to pay Dixon the funds on deposit, and Hamilton was directed to refund the Parks' security deposit. Hamilton's petition for relief against the lease forfeiture was denied (Code Civ. Proc., § 1179), and he appeals.

## II

Hamilton first argues Dixon's refusal to consent to the sublease was arbitrary and unreasonable. Although the lease did not prohibit an arbitrary

refusal, Hamilton claims the emerging concept of an implied covenant of good faith and fair dealing precluded Dixon from refusing to consent to a sublease without a reasonable and good faith objection. We reject the contention.

Historically California has recognized the right of commercial landlords to arbitrarily and unreasonably withhold consent to an assignment or sublease where there is no express leasehold provision to the contrary. (*Richard v. Degen & Brody, Inc.* (1960) 181 Cal.App.2d 289, 299 [5 Cal.Rptr. 263].) Two recent Court of Appeal cases have rejected the *Richard* rule, however, in view of the notion that an implied covenant of good faith and fair dealing exists in every commercial lease (and virtually every contract, for that matter). Under this analysis, "a lessor may refuse consent only where he has a good faith reasonable objection to the assignment or sublease, even in the absence of a provision prohibiting the unreasonable or arbitrary withholding of consent . . . ." (*Cohen* v. *Ratinoff* (1983) 147 Cal.App.3d 321, 330 [195 Cal.Rptr. 84]; see also *Schweiso* v. *Williams* (1984) 150 Cal.App.3d 883 [198 Cal.Rptr. 238].)[1]

The *Cohen* court provided examples of a "good faith reasonable objection [to the lease:] inability to fulfill terms of the lease, financial irresponsibility or instability, suitability of premises for intended use, or intended unlawful or undesirable use of premises." (*Id.,* at p. 330.) Relying on out of state authority, the court in *Schweiso* added, "denying consent solely on the basis of personal taste, convenience or sensibility or in order that the landlord may charge a higher rent than originally contracted for have been held arbitrary reasons failing the tests of good faith and reasonableness under commercial leases. [Citations.]" (*Schweiso* v. *Williams, supra,* 150 Cal.App.3d 883, 886, fn. omitted.)

In *Cohen,* the landlord refused to consent to the tenant's proposed assignment on the basis the lease did " 'not provide for assignment and [he could] be as arbitrary as he [chose].' " (*Cohen* v. *Ratinoff, supra,* 147 Cal.App.3d at p. 325.) The tenant sued, and the trial court granted the landlord's motion for judgment on the pleadings to causes of action for breach of contract and bad faith breach of contract. In reviewing the lease, the Court of Appeal determined it did authorize the voluntary assignment by the tenant with the lessor's prior consent and observed, "The duty of good faith and fair dealing, which is implicit in the lease entered into between plaintiff and defendant . . . militates against the arbitrary or unreasonable withholding of consent to an assignment." (*Id.,* at p. 330.)

---

[1]The Supreme Court has agreed to review the matter (*Kendall* v. *Ernest Pestana, Inc.* Cal.App. (hg. granted, Feb. 21, 1985, S.F. 24851)).

In *Schweiso* v. *Williams, supra,* 150 Cal.App.3d 883, several commercial tenants contracted to sell their businesses and assign the respective leases to third parties. The leases prohibited assignment without the lessors' written consent. In two cases, they refused to agree to the proposed assignments unless the tenants paid them 10 percent of the price negotiated for the sale of the businesses. In the third case, the lessors refused to consent to the assignment unless the tenant's brokers paid them one-half their commission. The brokers would not comply, and the sales contract was cancelled. The landlords and this tenant then agreed to the conditions under which the third tenant could sell his business and assign the lease. The tenant negotiated a new agreement with a different buyer on those terms, but the lessors reneged. The tenants and brokers sued. Discovery revealed the landlords told one tenant "1) [the paragraph prohibiting assignment with the written consent of the lessor] was the lessor's 'license to steal;' 2) the 10 percent transfer fee ($6,000) requested by the lessor was 'blood money;' and 3) the lessor had a right to be unreasonable." (*Id.,* at p. 885.) The landlords obtained summary judgment based on *Richard* v. *Degen & Brody, Inc., supra,* 181 Cal.App.2d 289. Agreeing with *Cohen* that the lessors owed the tenants a duty of good faith and fair dealing and finding a question of fact as to whether the lessors' conduct was arbitrary, the Court of Appeal reversed.

Dixon, however, unlike the lessors in *Cohen* and *Schweiso,* prevailed at trial, not at the pleading stage. Like the lessors in those cases, though, she refused to consent to the sublease only because she wanted to improve her financial position vis-à-vis the master lessee, a motive specifically condemned in *Schweiso.* But the trial court, relying on *Richard* v. *Degen & Brody, Inc., supra,* 181 Cal.App.2d 289, did not find it necessary to determine whether her conduct was arbitrary or unreasonable. Neither do we. For, even if we assumed Dixon's refusal to consent to the sublease was arbitrary, we would not apply the *Cohen-Schweiso* rule here. In most cases we see little reason for courts to interfere with the freedom of landlords and tenants to negotiate the terms of commercial leases. But here, there is an even more compelling reason *not* to meddle: The master lease was signed in 1970 when *Richard* was clearly the law and the provision was indisputably enforceable. The legal mutations which created the new species called implied covenants of good faith and fair dealing were mere spores in the halls of ivy then. Hamilton has offered no authority which would justify our ignoring the unambiguous language in the lease and rewriting the contract fifteen years later in derogation of Dixon's bargained-for rights and the reasonable expectations of the parties.

Moreover, the California Legislature has tacitly approved the right of lessors to arbitrarily or unreasonably withhold consent to assignment or subletting of premises by giving those who contract away that right addi-

tional remedies in the event of a breach by the tenant. The usual remedies of the lessor confronted with a tenant's breach are listed in Civil Code section 1951.2. Subdivision (a) provides, "if a lessee of real property breaches the lease and abandons the property before the end of the term or if his right to possession is terminated by the lessor because of a breach of the lease, the lease terminates." The lessor's right to recover rent from the defaulting tenant for the balance of the lease term, however, depends on the lessor's reletting the property and proving "that in reletting the property he acted reasonably and in good-faith . . . to mitigate the damages . . . ." (Civ. Code, § 1951.2, subd. (c)(2).)

But if the written lease of real property provides that the lessor's consent to an assignment or sublease "shall not unreasonably be withheld" (Civ. Code, § 1951.4, subd. (b)(3)), the lessor has an additional, and more attractive, remedy in the event of a breach by the tenant: The lease does not automatically terminate, "and the lessor may enforce all his rights and remedies under the lease, including the right to recover the rent as it becomes due" without mitigating damages or reletting the property. (Civ. Code, § 1951.4, subd. (b).) ■ In sum, Civil Code section 1951.4 provides both an explicit recognition by the Legislature of the right of landlords to bargain for the ability to arbitrarily withhold consent and an incentive not to do so. For that reason, it seems to us, any abrogation of that freedom should come not from the courts, but the Legislature.

■ Finally, we find Hamilton's anguished plea for equitable relief uncompelling. The facts—and equities—were set forth in poignant detail in Hamilton's motion for relief from forfeiture. Hamilton complained of the loss of large potential profits. The master lease called for $53,200 in payments to Dixon over the remainder of the lease term, although Dixon's obligation to pay a portion of the property taxes would reduce his tax liability by $3,000 over the remaining life of the lease. Under the sublease he negotiated with the Parks, on the other hand, he expected to receive $331,800 in rental income while shifting responsibility for payment of utilities and maintenance of the premises to the sublessees. Hamilton also complained he would lose the value of improvements he made to the property, but, of course, many of these had been financed by the Dixons at the outset.

By contrast, in a declaration in opposition to the petition, Dixon explained, "[I am] a widow aged 67 whose income upon which [I am] dependent consists of social security payments in the sum of $259.00 per month and rental income from the real property . . . subject to this lawsuit. [I live] alone in a mobile home . . . . [¶] . . . [T]o relieve Defendant Hamilton from the forfeiture of the subject lease would be a distinct and definite

hardship upon your declarant." The 15 years of shocking double-digit inflation experienced since this lease was executed for a flat monthly rate have reduced the original lease price to a pittance; but Hamilton, of course, strenuously objected to a reformation of the lease to adjust for this unforeseeable windfall. For the same reason, he is not entitled, in the name of equity, to have the antisublease provision rewritten in order to enforce an agreement which is no longer equitable to Dixon. He chose to stand on the lease *and* to execute the Park agreement in violation of the antisublease provision. Under these circumstances—even if it mattered—Dixon's decision to terminate could hardly be termed arbitrary or in bad faith.

### III

Hamilton next argues Dixon's refusal to consent to the sublease and her subsequent negotiation of a new lease with the Parks on substantially the same terms as his rejected sublease renders her liable in damages to him on the theory of tortious interference with contract relationships. He relies on *Richardson* v. *La Rancherita* (1979) 98 Cal.App.3d 73 [159 Cal.Rptr. 285], claiming it is "almost factually identical" to this case. He is wrong.

In *Richardson,* as here, the lease required the lessor's consent to any assignment or sublease. The corporate tenant, who was losing money, negotiated a sale of the assets of the business, contingent upon the lessor's consent to assignment of the lease. The lessor refused to consent unless the master lease was renegotiated to provide for increased rent, cost of living escalations, and use of an adjacent parking lot. The tenant and prospective buyer declined the terms and restructured the transaction as a sale of corporate stock only, with the corporation remaining as tenant. The lessor still objected, claiming, "the sale of stock, after a refusal to consent to a sale of assets, was merely a change of form to circumvent the consent provision of the lease." (*Id.,* at p. 78.) Confronted with the lessor's threat to declare the lease forfeited, the parties postponed the closing of the sale. The corporate tenant immediately sued for declaratory relief "to determine whether a transfer of the . . . stock constituted an assignment of [the] lease" (*ibid.*) and for damages based on intentional interference with the contract for the sale of stock. The sale of stock was consummated several weeks later.

Determining the sale of stock was not an assignment of the lease, the court granted summary judgment on the declaratory relief cause of action. The parties proceeded to trial on the cause of action for tortious interference with the contract for sale of the stock, and the tenant was awarded damages for losses sustained during the period in which the closing was delayed. The Court of Appeal affirmed: As a matter of law, the sale of stock was not an assignment in violation of the lease, and the lessor's conduct in

"[w]ithholding their consent pending negotiations with the prospective tenant to improve their financial interest was [not] proper." (*Id.*, at p. 80.)

The distinctions between this case and *Richardson* are readily apparent. First, the triggering event in *Richardson* was the execution of a contract for sale of corporate stock, which did not breach the lease. Thus, the lessor was liable for tortious interference with a contract the tenant was not prohibited from negotiating. But here, Hamilton's execution of the sublease without Dixon's written consent did breach the lease, entitling her to unilaterally sever the landlord-tenant relationship. It would defy all logic to then permit Hamilton to recover tort damages for Dixon's alleged interference with Hamilton's breach of his contract with her.

Another recent opinion, rendered after the briefing in this case was completed, and dealing with the tort of interference with contract under similar circumstances, requires comment. In *Sade Shoe Co. v. Oschin & Snyder* (1984) 162 Cal.App.3d 1174 [209 Cal.Rptr. 124], the lease included the typical clause prohibiting assignment or subleasing without the lessor's written consent. But it also provided, in the case of a corporate tenant, that the sale of the voting shares of stock was deemed to be an assignment requiring the lessor's written consent. The corporate tenant negotiated a sale of stock to Sade Shoe Co. and, as obligated by the lease, sought the lessor's consent to the stock transfer. The lessor refused, allegedly "for its own personal gain and benefit in the form of regaining possession of the leased premises and/or extracting additional rent." (*Id.*, at p. 1178.) The deal collapsed, and the prospective purchaser sued the lessor for loss of anticipated profits and punitive damages on the theory of tortious interference with contract.

The lessor demurred, arguing the lease allowed for an arbitrary and unreasonable refusal to consent. The demurrer was sustained without leave to amend. The Court of Appeal reversed. Acknowledging *Richard* v. *Degen & Brody, Inc.*, *supra*, 181 Cal.App.2d 289 authorized the lessor to arbitrarily withhold its consent to an assignment of the lease, the court nevertheless determined that fact did "not resolve the issue whether such conduct on defendant's part was justified, thereby furnishing a defense to each of plaintiff's causes of action. (See *Richardson* v. *La Rancherita* [*supra*] 98 Cal.App.3d 73, 80-82.)" (*Id.*, at p. 1179.)[2] The court concluded the latter question was one of fact turning "'on the defendant's predominant purpose in inducing the breach of the contract.' [Citation.]" (*Id.*, at p. 1181.)

Here, of course, the trial court found, as a matter of fact, that Dixon was justified in refusing to consent to the assignment and was not liable to Ham-

---

[2]The opinion does not cite *Cohen* v. *Ratinoff, supra,* 147 Cal.App.3d 321 or *Schweiso* v. *Williams, supra,* 150 Cal.App.3d 883.

ilton for tortious interference with contract. Moreover, Dixon did not interfere with the sale of the business by Wolf to the Parks. And the Parks do not complain, for they purchased the business and obtained a lease with Dixon on substantially the same terms offered by Hamilton.

Nevertheless, we are somewhat bemused by the result in *Sade Shoe.* We realize it is a pleading case only, and there is no direct suggestion in the opinion as to what the ultimate outcome should be. We also recognize it was the prospective purchaser and not the tenant in privity with the lessor who sued. Still, it appears incongruous to accept *Richard,* as the court apparently did, and yet permit the pursuit of a cause of action for tortious interference with contractual relations. If there was ever a case in which the landlord sought to protect the right to veto a change in tenant, *Sade Shoe* is it; and the landlord undoubtedly paid for that right in some manner in the lease negotiations. It is not, as we stated earlier, for the courts to rewrite the bargain.

## IV

Hamilton's remaining contentions may be discussed together. He argues: (1) The breach was trivial and did not justify a forfeiture; (2) Dixon's oral consent to the Park sublease estopped her from refusing to give written consent; (3) her negotiation of a master lease with the Parks constituted a waiver of her right to object to his sublease with them; and (4) even if the Park sublease was not valid, the Wolf sublease nevertheless survived. The first three issues were considered by the trial court and resolved against Hamilton. As to them, substantial evidence supports the court's findings; we find no error.

His final point also lacks merit. When Hamilton executed the Park sublease, he breached the master lease. Dixon's rightful severance of the relationship terminated his interest in the property and, consequently, the Wolf sublease. No leasehold provision or article of law conferred the power to resurrect his former position. Hamilton insisted on the full exercise of his leasehold rights in his dealings with Dixon, and that is exactly what he obtained in the superior court.

Judgment affirmed. Respondent is entitled to costs on appeal.

Sonenshine, Acting P. J., and Wallin, J., concurred.