[No. A036017. First Dist., Div. Four. Feb. 5, 1988.]

DENZIL KREISHER, Plaintiff and Appellant, v.
MOBIL OIL CORPORATION et al., Defendants and Appellants.

**[Opinion certified for partial publication.*]**

---

* Parts II through IX are not ordered published, as they do not meet the standards for publication contained in rule 976(b) of the California Rules of Court.

**COUNSEL**

Todd C. Hedin, Nelson, Boyd, MacDonald, Mitchell, Mason & Hedin and John R. Wolf for Plaintiff and Appellant.

David M. Heilbron, John R. Reese, Leslie G. Landau, Donna M. Ryu, McCutchen, Doyle, Brown & Enersen and William K. O'Brien for Defendants and Appellants.

**OPINION**

POCHÉ, J.—The primary issue presented is this: Are judicial decisions holding that a contracting party's right to refuse consent to an assignment

must be exercised in accordance with standards of commercial reasonableness and good faith to be retroactively applied to a situation where a contrary rule prevailed at the time all actions which subsequently formed the basis for this litigation occurred? Our answer is no.

### BACKGROUND AND PROCEDURAL HISTORY

The following is an abbreviated narrative of a massive record, restricted to those matters germane to the limited approach and holding adopted for purposes of resolving these appeals.

From 1971 through 1980, plaintiff Denzil G. Kreisher operated a service station in San Rafael. Plaintiff's franchise relationship with defendant Mobil Oil Corporation (Mobil) throughout this period was governed by a trio of contracts. Each contract, which had a term of three years, was comprised of a pair of documents, a "Retail Dealer Contract" and a separately executed "Service Station Lease." On December 22, 1980, plaintiff and Mobil formally executed a new agreement continuing plaintiff's franchise and tenancy for the period commencing January 1, 1981, and concluding December 31, 1983. Included in the "Retail Dealer Contract" and the "Service Station Lease" were provisions forbidding assignment without Mobil's written consent.[1] The following events occurred in 1981:

Plaintiff received a letter from Mobil on May 6 informing him that "you are in default of the Lease by reason of failure to operate the marketing premises for more than seven consecutive days" and that unless this default was cured within 10 days Mobil "will terminate said Lease effective May 18." Plaintiff notified Mobil, by a letter dated May 12, that he had received an offer from Robert Gregory Enterprises, Inc. to purchase the franchise for $28,000. Plaintiff asked "whether Mobil will consent to the transfer." Six days later, Mobil sent plaintiff a letter announcing its election to "terminate the Service Station Lease and franchise relationship between us, effective June 18." On May 28 plaintiff was notified by letter that "Mobil does not consent to the proposed transfer."

Mobil learned in early June that plaintiff had not maintained insurance as required by the contract. It therefore, on June 16, transmitted a notice to plaintiff advising him that this and other acts and omissions constituted "further default" which Mobil "considered substantial in nature and make

---

[1] Paragraph 18 of the "Retail Dealer Contract" read: "Any assignment of this contract by Buyer [plaintiff] without Seller's [Mobil's] written consent shall be void." Paragraph 15 of the "Service Station Lease" read: "Any assignment, mortgage or pledge of this lease or any interest therein or any subletting of the premises, in whole or in part, by Tenant [plaintiff] without Landlord's [Mobil's] written consent shall be void."

termination of your franchise, effective June 18, . . . reasonable and necessary." Mobil learned several days later that plaintiff's resale permit had been revoked by the State Board of Equalization effective March 31 of that year. Mobil served on plaintiff a three-day notice to quit the premises on June 29.

In July plaintiff advised Mobil that he had a further offer of $31,000 from Cesar Faedi for the franchise, again asking "if Mobil wishes to purchase the franchise or will consent to the transfer to Mr. Faedi."[2] Mobil apparently rejected both aspects later that month when it responded that "the proposed assignment may be considered in light of existing circumstances."

Mobil initiated an unlawful detainer proceeding against plaintiff in September. About that time plaintiff submitted a third and final proposed assignment, which was apparently rejected by Mobil in the belief that plaintiff no longer had any interest to assign. Plaintiff relinquished possession of the premises in January of 1982 without the necessity of judicial action.

Plaintiff commenced this action on August 5, 1982. In its final form, his complaint purported to allege eight causes of action which may be identified as follows: (1) breach of the contract and implied covenants of good faith

---

[2]Plaintiff's offer that Mobil itself purchase the franchise purported to be based upon Business and Professions Code section 21148, subdivision (a), which provides: "Notwithstanding the terms of any franchise, a franchisor may not withhold its consent to the sale, transfer, or assignment of the franchise by the franchisee to another person unless the franchisor demonstrates any of the following:

"(1) The proposed purchaser of the franchise has less business experience and training than that normally required by the franchisor of prospective franchisees.

"(2) The proposed purchaser of the franchise has less financial resources than that normally required by the franchisor of prospective franchisees.

"(3) The proposed purchaser of the franchise does not satisfy the then-current uniformly applied requirements, if any, of the franchisor applicable to prospective franchisees.

"(4) The proposed purchaser of the franchise operates a franchise under an agreement with a franchisor other than the franchisor to whom the sale, transfer, or assignment is proposed, if the then-current uniformly applied requirements, if any, of the franchisor precludes prospective franchisees from operating a franchise under an agreement with another franchisor.

"(5) The franchisee has not offered in writing to sell, transfer, or assign the franchise to the franchisor on terms and conditions which are the same as those of the sale, transfer, or assignment of the franchise to the proposed purchaser; and the franchisee has not allowed the franchisor at least 30 days in which to either accept or decline the franchisee's written offer, prior to the sale, transfer, or assignment of the franchise to the proposed purchaser."

This statute was added by an enactment which became effective on January 1, 1981, and which specifically provided that "This act shall not apply to a franchise entered into before the effective date of this act." (Stats. 1980, ch. 698, § 4, p. 2101.)

After plaintiff had notified Mobil of the Gregory offer, he invoked Business and Professions Code section 21148 when he offered to sell the franchise to Mobil on the same terms as the Gregory offer. Mobil responded that plaintiff's 1980 contract was not governed by the subsequently enacted statute.

and fair dealing for Mobil's "failing and refusing to consent to transfer or sale of the franchise and lease without reasonable or permissible grounds . . . and . . . by withholding consent . . . although each of such proposed franchise purchasers was ready, willing, able and qualified to perform all obligations of a franchisee and leasee [*sic*]"; (2) unreasonable withholding of consent to a transfer in violation of Business and Professions Code section 21148 (see fn. 2 and accompanying text, *ante*); (3) "wrongful and retaliatory constructive eviction constituting termination of the franchise without good cause"; (4) "tortious breach of implied covenants of good faith and fair dealing" for Mobil's "failing and refusing to process and allow sale . . . of the franchise"; (5) negligent interference with prospective economic advantage; (6) intentional interference with prospective economic advantage; (7) intentional infliction of emotional distress for a variety of acts including the "refus[al] to provide reasonable explanation for . . . withholding of consent to transfer the franchise" and evicting plaintiff "from the gasoline station premises"; and (8) violation of the federal Petroleum Marketing Practices Act (PMPA; 15 U.S.C. § 2801 et seq.).[3] After sustaining a demurrer without leave to amend the second cause of action, the trial court granted defendants summary judgment on plaintiff's third, fourth and fifth causes of action, but ruled that the remainder of plaintiff's case presented material issues of fact to be decided by a jury.

Trial commenced on October 9, 1985. The presentation of evidence occupied five weeks. On December 3, having deliberated on plaintiff's first, sixth, seventh, and eighth causes of action for seven days, the jury returned its verdict finding (among other things) that: (1) Mobil breached its contract with plaintiff by refusing to consent to the proposed transfer; (2) defendants intentionally interfered with plaintiff's prospective economic advantage; and (3) defendants intentionally inflicted emotional distress upon plaintiff. The jury further found plaintiff entitled to recover compensatory damages of $214,000 (including $31,000 for loss of his home) and punitive damages of $2,002,500.

After the jury had been discharged, the court filed an order in which it: (1) denied plaintiff any recovery pursuant to his PMPA cause of action on the dual grounds that "federal courts have exclusive jurisdiction over

---

[3] Named as defendants in the complaint were Mobil and its employees R. E. Kolberg, Kevin J. Reilly, Joseph B. Wright, and James A. Edwards. The complaint was dismissed as against Kolberg. With respect to Reilly and Wright, the jury was unable to return a verdict and further proceedings are being held in abeyance pending this outcome of these appeals. Edwards, who together with Mobil will hereinafter be collectively referred to as defendants, is at present liable with Mobil for the compensatory damages and costs awarded plaintiff, as well as $2,500 punitive damages.

The complaint was also filed on behalf of plaintiff's wife Dorothy Kreisher. The jury was unable to reach agreement concerning her claims. She is not a party to this appeal.

actions brought under the PMPA" and "plaintiff's PMPA claim is barred by the statute of limitations" included in that statutory scheme; and (2) granted plaintiff's request for prejudgment interest pursuant to Civil Code section 3291 and Code of Civil Procedure section 998. On May 20, 1986, the court entered a judgment directing that plaintiff recover compensatory damages of $214,000, punitive damages of $2,002,500, both with interest from the date of plaintiff's compromise offer made in May of 1983, and costs of $22,719.24, on his first, sixth, and seventh causes of action. The judgment was in defendants' favor on all remaining causes of action.

Defendants then filed a conjoint motion for judgment notwithstanding the verdict and for new trial. In connection therewith the trial court filed an order in which it: (1) denied the motion for judgment notwithstanding the verdict; (2) conditionally granted the alternative motion for a new trial unless plaintiff consented to a reduction in the judgment of $31,000, representing the amount of equity in the home plaintiff had sold as an alleged consequence of his dispute with Mobil; and (3) vacated the award of prejudgment interest.

Defendants thereupon filed a timely notice of appeal from the judgment. Plaintiff has appealed from the new trial order and from the order rejecting his PMPA cause of action. Plaintiff has also taken a protective cross-appeal from various portions of the judgment.

REVIEW

I

The contractual provisions at issue here (see fn. 1, *ante*) gave Mobil the express right to refuse its consent to a proposed transfer of plaintiff's franchise. No restriction upon Mobil's exercise of that right is apparent from the plain language of the provisions, which are therefore to be treated as conferring an absolute and unfettered discretion justifying a refusal without regard to the nature or even enunciation of any objection. The evolution and doctrinal explanation of how such a power came to be subject to considerations of commercial reasonability and the implied covenant of good faith and fair dealing is recounted in *Kendall* v. *Ernest Pestana, Inc.* (1985) 40 Cal.3d 488 [220 Cal.Rptr. 818, 709 P.2d 837], and consequently need not be repeated here. More relevant for present purposes is the synthesis of that history and the chronology of events in this case.

" '[W]here a subletting or assignment of the leased premises without the consent of the lessor is prohibited, he may withhold his assent arbitrarily and without regard to the qualifications of the proposed assignee, unless, . . . the lease provides that consent shall not be arbitrarily or unreasonably

withheld, and in granting his assent may impose such conditions as he sees fit. Accordingly, if . . . the lessor does not covenant to give his consent to an assignment or subletting, the lessee has no remedy against the lessor for his refusal to consent thereto.' " This 1960 holding by the Court of Appeal in *Richard* v. *Degen & Brody, Inc.* (1960) 181 Cal.App.2d 289, 299 [5 Cal.Rptr. 263], stood unimpeached until September of 1983, when a different Court of Appeal concluded in *Cohen* v. *Ratinoff* (1983) 147 Cal.App.3d 321 [195 Cal.Rptr. 84], that a lessor could breach a contract by exercising the power to withhold consent in an arbitrary or unreasonable manner incompatible with the duty of good faith and fair dealing. *Cohen* was accepted and followed less than four months later by Division Three of this court in *Schweiso* v. *Williams* (1984) 150 Cal.App.3d 883 [198 Cal.Rptr. 238].

All of the events at issue here occurred during the period when *Richard* was taken to state the applicable rule of law. The parties' execution of the contract, the termination of plaintiff's franchise, his departure from the premises, and his initiation of this action, had all transpired by October of 1982, 11 months before *Cohen* was decided and 15 months before this court first took a position on the problem in *Schweiso*. Review of neither decision was sought in the Supreme Court. By the time these decisions were final plaintiff had filed his third amended complaint which, with a further amendment permitted by the trial court, was the pleading on which the case would eventually be submitted to the jury.

Further confusion was to follow. In December of 1984 Division Three reversed itself and repudiated its prior decision in *Schweiso*, terming it and *Cohen* "wrongly decided." The occasion for this return to the *Richard* rule was *Kendall* v. *Ernest Pestana, Inc.*, which the Supreme Court agreed to hear in February of 1985. In *Hamilton* v. *Dixon* (1985) 168 Cal.App.3d 1004 [214 Cal.Rptr. 639], decided in May of 1985, yet another Court of Appeal followed *Richard* in preference to *Cohen* and *Schweiso*. Our parties were at that time contesting defendants' motion for summary judgment and plaintiff's request for leave to file an amendment to his third amended complaint.

The dust did not settle until December 5, 1985. It was on that date that the Supreme Court filed its *Kendall* opinion, thus aligning itself with the *Cohen-Schweiso* position and disapproving *Richard* and *Hamilton*. (*Kendall* v. *Ernest Pestana, Inc., supra,* 40 Cal.3d 488 at pp. 496-498.) That was two days after the jury returned its verdict in this case.

Defendants' position at all times has had a dual thrust. They first argue that *Cohen, Schweiso,* and later *Kendall* have no application because they

dealt with simple commercial leases whereas the fundamental nature of Mobil's contract with plaintiff was a "franchise agreement for personal services." Their fall-back argument is that if these decisions do govern a contract of the sort between plaintiff and Mobil, the decisions contrary to the *Richard* rule upon which defendants relied should not be given retroactive application. Although we disagree with defendants' characterization of the contract as one for personal services, we sustain their contention that *Cohen, Schweiso,* and *Kendall* should not be retroactively applied in this case.

## (A)

■ Defendants' attempt to transmute the lease into an inconsequential and severable appendage of the "Retail Dealer Contract" is unconvincing. Included in the latter document immediately following the assignment provision (quoted *ante* at fn. 1) is an integration clause to the effect that "This instrument, including . . . *any lease* of the premises from Seller to Buyer, contain[s] the entire agreement covering the subject matter, and supersedes any prior *supply* contract between the parties *relating to the premises.*" (Italics added.) As may be inferred from the underscored passages, this provision evidences Mobil's own view of the relationship between itself and plaintiff as being predominantly concerned with the sale of Mobil's products. The lease provided the site at which these sales would occur. That site, described in the "Retail Dealer Contract" as "the marketing premises," was crucial to the franchise relationship. All deliveries were to be made at that site. The contract could be terminated for a variety of reasons connected with the leasehold, including: (1) termination of the lease; (2) condemnation or destruction of the premises; (3) plaintiff's failure "to operate the marketing premises for 7 consecutive days;" (4) plaintiff's failure "to comply with federal, state or local laws, rules, regulations or ordinances relevant to the operation of the marketing premises;" (5) repeated customer complaints concerning "operation of the marketing premises;" and (6) plaintiff's failure "to operate its premises in a clean, safe and healthful manner." Identical provisions were also included in the lease.

Without question, plaintiff's personal qualifications and labor constituted an important component of the process by which Mobil's goods would be furnished to the public. Yet plaintiff's personal services would be provided, not at any place of his choosing, but only at the "marketing premises" specifically designated in both the "Retail Dealer Contract" and the lease. The idea that plaintiff's personal services were the essence of the relationship is further refuted by the very presence of the assignment provisions: if plaintiff's services were so unique and vital Mobil would have no reason either to contemplate or to make provision for any possible substitution.

What was crucial to Mobil's commercial goal was the provision of a location for sale of its products, particularly an existing location devoted to that purpose and under Mobil's continuing control. Construing the two documents as comprising a single agreement (Civ. Code, § 1642; cf. *Mobil Oil Corp.* v. *Handley* (1978) 76 Cal.App.3d 956, 959, 963 [143 Cal.Rptr. 321]; *Prestin* v. *Mobil Oil Corp.* (9th Cir. 1984) 741 F.2d 268, 271-272), we are compelled to reject defendants' attempt to recast it as being primarily concerned with plaintiff's personal services.

### (B)

It is a truism that the law constantly struggles to resolve the tension between the competing needs of stability and change, both of which it must serve. One aspect of this continual dilemma is whether completed events and transactions are to be governed by subsequently announced principles or changes in legal doctrine. This is the nettle we must now grasp.

■ California follows the rule of practice that decisions of its appellate courts, particularly those of the Supreme Court, are ordinarily retrospective in operation. (See *In re Marriage of Brown* (1976) 15 Cal.3d 838, 850 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164]; *Twine* v. *Compton Supermarket* (1986) 179 Cal.App.3d 514, 518 [224 Cal.Rptr. 562]; *McManigal* v. *City of Seal Beach* (1985) 166 Cal.App.3d 975, 981 [212 Cal.Rptr. 733].) With respect to civil cases, exemptions from this principle have in general been recognized "when considerations of fairness and public policy preclude full retroactivity" (*Peterson* v. *Superior Court* (1982) 31 Cal.3d 147, 152 [181 Cal.Rptr. 784, 642 P.2d 1305]; accord *Isbell* v. *County of Sonoma* (1978) 21 Cal.3d 61, 74 [145 Cal.Rptr. 368, 577 P.2d 188]; *Safeway Stores, Inc.* v. *Nest-Kart* (1978) 21 Cal.3d 322, 333 [146 Cal.Rptr. 550, 579 P.2d 441]; *Paul E. Iacono Structural Engineer, Inc.* v. *Rizzo* (1984) 162 Cal.App.3d 803, 809 [208 Cal.Rptr. 787]), particularly if retroactive application of the new authority will disturb vested rights of property or contract. (See *Peterson* v. *Superior Court, supra*; *County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 681 [312 P.2d 680]; cf. *Wellenkamp* v. *Bank of America* (1978) 21 Cal.3d 943, 953-954 [148 Cal.Rptr. 379, 582 P.2d 970]; *Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438, 456-457 [326 P.2d 484].) "The determination by the court is dependent upon the equities in each case." (*County of Los Angeles* v. *Faus, supra,* at p. 680.)

"Two factors of primary importance in resolving the issue of retroactivity are the extent to which the change in the law was foreshadowed and foreseeable and the extent of the reliance placed upon the former rule of law." (*Barber* v. *State Personnel Bd.* (1976) 18 Cal.3d 395, 400 [134 Cal.Rptr. 206, 556 P.2d 306]; accord *United States Cold Storage* v. *Great Western*

*Savings & Loan Assn.* (1985) 165 Cal.App.3d 1214, 1222 [212 Cal.Rptr. 232]; *Pillsbury* v. *South Coast Regional Com.* (1977) 71 Cal.App.3d 740, 755 [139 Cal.Rptr. 760].) In determining the retroactivity of its decisions in the area of criminal law, the United States Supreme Court formulated these criteria: "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." (*Stovall* v. *Denno* (1967) 388 U.S. 293, 297[18 L.Ed.2d 1199, 1203].) These criteria have been incorporated within the "considerations of fairness and public policy" factors employed by California in the context of civil cases. "Public policy considerations include the purpose to be served by the new rule, and the effect on the administration of justice of retroactive application. Considerations of fairness would measure the reliance on the old standards by the parties or others similarly affected, as well as 'the ability of litigants to foresee the coming change in the law . . . .'" (*Peterson* v. *Superior Court, supra,* 31 Cal.3d 147 at pp. 152-153.)[4] Each of these factors and considerations will now be examined.

 *Foreseeability.* Can Mobil be charged with failing to anticipate the demise of the *Richard* rule? That rule had stood for more than 20 years by the time it was invoked by Mobil. It is true that there had been academic criticism (see Kehr, *Lease assignments: The landlord's consent* (1980) 55 State Bar J. 108; note, *Effect of Leasehold Provisions Requiring the Lessor's Consent to Assignment* (1970) 21 Hastings L.J. 516)[5] and that the covenant of good faith and fair dealing was being applied to an increasing variety of contracts. (See *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 768 [206 Cal.Rptr. 354, 686 P.2d 1158]; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, §§ 743-752, pp. 674-683.) On the other hand, *Richard,* which was decided well after the concept of the good faith covenant had been recognized, had never been judicially

---

[4] The standards applied by the United States Supreme Court in deciding the retroactivity of its holdings in civil cases is generally comparable to the matters which guide California courts. The federal civil standards were stated in *Chevron Oil Co.* v. *Huson* (1971) 404 U.S. 97, 106-107 [30 L.Ed.2d 296, 306]: "First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed, . . . Second, it has been stressed that 'we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' . . . Finally, we have weighed the inequity imposed by retroactive application, for '[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the "injustice or hardship" by a holding of nonretroactivity.'" (See also *Northern Pipeline Co.* v. *Marathon Pipe Line Co.* (1982) 458 U.S. 50, 87-88 [73 L.Ed.2d 598, 625-626] (plurality opinion); *United States* v. *Johnson* (1982) 457 U.S. 537, 563 [73 L.Ed.2d 202, 222-223].)

[5] Plaintiff mentioned only the first of these articles in the trial court.

questioned in this state. Moreover, it conformed with the rule prevailing in the majority of other states throughout the country. (See *Kendall* v. *Ernest Pestana, Inc., supra,* 40 Cal.3d 488 at pp. 495-496.) *Richard* must also be seen as one aspect of a large body of California authority to the effect that "[i]n the absence of a controlling statute the parties may provide that a contract right or duty is nontransferable." (*Masterson* v. *Sine* (1968) 68 Cal.2d 222, 230 [65 Cal.Rptr. 545, 436 P.2d 561]; accord *La Rue* v. *Groezinger* (1890) 84 Cal. 281, 283 [24 P. 42]; *Benton* v. *Hofmann Plastering Co.* (1962) 207 Cal.App.2d 61, 67-69 [24 Cal.Rptr. 268]; *Parkinson* v. *Caldwell* (1954) 126 Cal.App.2d 548, 552-553 [272 P.2d 934]; *Fairbanks* v. *Crump Irr. etc. Co., Inc.* (1930) 108 Cal.App. 197, 205 [291 P. 629].)

The matter of foreseeability is thus ambiguous. An argument can be made, albeit concededly upon a purely speculative basis, that the validity of the *Richard* rule was questionable and might be overtaken by the advance of the covenant of good faith and fair dealing. The signals to that effect were, however, weak and largely nonjudicial. The opposing argument is that *Richard* had stood the test of time and could be treated as sound doctrine well within the mainstream of California and national authority. As will be seen shortly, Mobil had received a recent indication that *Richard* was still accepted as stating the governing principle. We therefore conclude that on balance Mobil should not be penalized for its inability to predict the emergence of the judicial repudiation of *Richard* more than two years later.[6] (Cf. *People* v. *Horning* (1984) 150 Cal.App.3d 1015, 1022 [198 Cal.Rptr. 384]; *People* v. *Criscione* (1981) 125 Cal.App.3d 275, 295 [177 Cal.Rptr. 899].)

*Reliance.* This factor is completely in Mobil's favor. At the time Mobil refused to consent to each of plaintiff's proposed assignees, the *only* authority squarely on point was *Richard*. The contrary holdings of *Cohen, Schweiso,* and *Kendall* were nothing more than glints in the eyes of imaginative attorneys awaiting future vindication. Mobil clearly was aware of *Richard* and acted in accordance with it. About the time the 1980 franchise agreement was executed, Mobil was advised by independent counsel that *Richard* was still valid. Mobil saw this advice upheld when it thereafter won two unrelated actions in federal district courts in California. In short, the extent of Mobil's reliance on the *Richard* rule was total.

■ *Public policy.* What are the justifications for restricting a lessor's unfettered power to refuse consent to an assignment? The two reasons given

---

[6]The emphasis on *judicial* action is not inadvertent. If anything, Mobil could logically conclude that with the passage of Business and Professions Code section 21148 the Legislature had in effect occupied the field and thus obviated the likelihood of further action by the courts. Mobil could further conclude that the Legislature's exemption of franchise agreements "entered into" before January 1, 1981 (see fn. 2, *ante*) preserved the *Richard* rule's applicability to such agreements.

by courts are California's hostility to restraints on alienation and its preference for fostering the performance of contracts in accordance with "the standards of good faith and commercial reasonableness." (See *Kendall* v. *Ernest Pestana, Inc., supra,* 40 Cal.3d 488 at pp. 498-501, 506; *Schweiso* v. *Williams, supra,* 150 Cal.App.3d 883 at pp. 885-887; *Cohen* v. *Ratinoff, supra,* 147 Cal.App.3d 321 at pp. 328-330.) In addition, and more particularly, there are the specific statutory limitations of a franchisor's power to refuse consent expressed in Business and Professions Code section 21148. (See fn. 2, *ante.*) Within the context of this case, these judicial and legislative determinations embody a balance between common law rights of contract and the legitimate concerns of lessors. The former are to be limited because "[w]e are no longer in the days of caveat emptor even as to commercial leases . . . [and] the necessity of permitting reasonable alienation of commercial space has become paramount in our increasingly urban society." (*Schweiso* v. *Williams, supra,* at p. 887.) The latter remain secured because "the lessor's interest in the character of his or her tenant is protected by the lessor's right to object to a proposed assignee on reasonable commercial grounds . . . [and] by the fact that the original lessee remains liable to the lessor as a surety even if the lessor consents to the assignment and the assignee expressly assumes the obligations of the lease." (*Kendall* v. *Ernest Pestana, Inc., supra,* at p. 500.)

▇▇▇ *Fairness.* The public policy restraining this form of arbitrary action by a franchisor-lessor is strong, but what are the countervailing fairness considerations? Reliance, which has been discussed above, is one such factor. In the circumstances presented here, its influence is crucial.

With respect to obligations undertaken pursuant to a statute subsequently found invalid, the United States Supreme Court stated: "The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration. The effect of the subsequent ruling as to invalidity may have to be considered in various aspects,—with respect to particular relations, individual and corporate, and particular conduct, private and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination. These questions are among the most difficult of those which have engaged the attention of the courts, state and federal, and it is manifest . . . that an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified." (*Chicot County Dist.* v. *Bank* (1940) 308 U.S. 371, 374 [84 L.Ed. 329, 332-333].) We agree with numerous distinguished commentators (Schaefer, *Prospective Rulings: Two Perspectives,* 1982 Sup. Ct. Rev. 1, 23; Leflar,

*Appellate Judicial Innovation* (1974) 27 Okla. L.Rev. 321, 342; Snyder, *Retrospective Operation of Overruling Decisions* (1940) 35 Ill. L.Rev. 121, 132, fn. 117) that these considerations are equally relevant to judicial decisions. Let us now examine how they operate in this case.

■ One of the fundamental purposes of law is to provide stability. The announcement of a legal principle, whether by the Legislature or by the courts, furnishes notice of what is either allowed or prohibited. Such notice is the most elemental requirement of due process. (See *Cleveland Board of Education* v. *Loudermill* (1985) 470 U.S. 532, 546 [84 L.Ed.2d 494, 506]; *Fuentes* v. *Shevin* (1972) 407 U.S. 67, 80 [32 L.Ed.2d 556, 569-570]; *Mullane* v. *Central Hanover Tr. Co.* (1950) 339 U.S. 306, 314 [94 L.Ed. 865, 873]; *Randone* v. *Appellate Department* (1971) 5 Cal.3d 536, 541 [96 Cal.Rptr. 709, 488 P.2d 13]; *Mendoza* v. *Small Claims Court* (1958) 49 Cal.2d 668, 672 [321 P.2d 9]; *Conservatorship of Moore* (1986) 185 Cal.App.3d 718, 725 [229 Cal.Rptr. 875].) Blackstone deemed it a "requisite" that legal change "be notified to the people who are to obey it." (1 Blackstone, Commentaries 45.) He denounced the "making of laws *ex post facto*" because "it is impossible that the party could foresee that an action[,] innocent when it was done, should be afterwards coverted to guilt by a subsequent law; he had therefore no cause to abstain from it; and all punishment for not abstaining must of consequence be cruel and unjust." (*Id.* at p. 46.)

Strictly speaking, the category of ex post facto laws of which Blackstone spoke is now confined to the criminal. (*Calder* v. *Bull* (1798) 3 U.S. 386, 390 [1 L.Ed. 648, 650]; *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 180 [167 Cal.Rptr. 854, 616 P.2d 836]; *Campbell* v. *Department of Motor Vehicles* (1984) 155 Cal.App.3d 716, 718 [202 Cal.Rptr. 324].) Still, the disinclination to penalize action "innocent when it was done" has reached the civil sector and is not limited to legislation. At the close of the last century our Supreme Court stated: " 'It would be as mischievous as an *ex post facto* law to permit a subsequent [judicial] decision to overturn the fair compromises and contracts of individuals made under a different and correct view of the law. . . .The agreement was in exact accordance with the general understanding of the law at the time it was made. Two years afterward the court of appeals, in another case, gave a different construction. The community would be in a miserable condition if at every change of opinion upon questions of law all their previous contracts and settlements were to be overturned. Men could never know the end of their controversies were such a rule to prevail.'[¶]. . . 'A subsequent decision of a higher court, in a different case, giving a different exposition to a point of law from the one declared and known, when a settlement between parties takes place, cannot have a retrospective effect and overturn such settlement. . . .There

is no other principle which is safe and practicable in the common intercourse of mankind. And to permit a subsequent judicial decision in any one case on a point of law to open and annul everything that has been done in other cases of a like kind for years before, under a different understanding of the law, would lead to the most mischievous consequences. Fortunately for the peace and happiness of mankind, no such pernicious precedent is to be found. *The case is, therefore, to be decided according to the existing state of things when the settlement in question took place.'* " (*Cooley* v. *County of Calaveras* (1898) 121 Cal. 482, 486 [original italics] [53 P. 1075]; see 1 Kent, Commentaries on American Law (14th ed. 1896) 476.) There are comparable statements of a more recent vintage. (See *California Assn. of Highway Patrolmen* v. *Department of Personnel Admin.* (1986) 185 Cal.App.3d 352, 364-365 [229 Cal.Rptr. 729]; *Mitchell* v. *National Auto & Casualty Ins. Co.* (1974) 38 Cal.App.3d 599, 604-605 [113 Cal.Rptr. 391]; *Bank of America* v. *Department of Mental Hygiene* (1966) 246 Cal.App.2d 578, 586-587 [54 Cal.Rptr. 899].)

The motivation for such expressions is not limited to courts. The Legislature's enactment of Business and Professions Code section 21148 evidences its interest and concern with the specific problem of franchisor power to prevent assignment. The substance of that statute aligns the Legislature with the judicial position expressed in *Cohen, Schweiso,* and *Kendall.* Nevertheless, the Legislature took pains to establish that section 21148 "shall not apply to a franchise entered into before the effective date of this act." (See fn. 2, *ante.*) This decision represents the Legislature's considered assessment that the benefits of change do not outweigh the necessity or desirability of respecting existing contracts and leaving them unaffected by the statute. That assessment commands our attention, even if it involves staying the impact of judicial decisions, because "the Legislature is no less competent than the court to evaluate the hardships involved and decide whether *considerations of fairness and public policy* warrant the granting of relief." (*Forster Shipbldg. Co.* v. *County of L. A.* (1960) 54 Cal.2d 450, 459 [italics added] [6 Cal.Rptr. 24, 353 P.2d 736]; accord *County of Los Angeles* v. *Superior Court* (1965) 62 Cal.2d 839, 845 [44 Cal.Rptr. 796, 402 P.2d 868]; *Schettler* v. *County of Santa Clara* (1977) 74 Cal.App.3d 990, 998 [141 Cal.Rptr. 731]; *Atlantic Richfield Co.* v. *County of Los Angeles* (1977) 68 Cal.App.3d 105, 115 [137 Cal.Rptr. 84].)

There is much to commend in the balance struck by the Legislature's conscious decision to impose new standards but not make them retroactive. It recognizes that fairness must be done to both parties to a franchise arrangement. The franchisee is afforded an increased measure of security by the limitations imposed upon a franchisor's previously unrestricted common law and contractual right to refuse assent to an assignment. The

franchisor is given clear notice concerning the precise nature of those limitations (which appear to correspond to the judicially formulated standard of "commercial reasonableness"). The public policy behind Business and Professions Code section 21148 is clear and of sufficient gravity to receive legislative recognition. Nevertheless, the advantages were not deemed of sufficient import to warrant the disturbance of existing franchise relationships. This compromise was made within the context of vested contractual rights involving the security of title to real property, a situation where the need for stability is at a premium. (See *Wellenkamp* v. *Bank of America, supra,* 21 Cal.3d 943 at p. 954.) The Legislature deemed these considerations of such magnitude to warrant deferring the implementation of the public policy goals.

■ Our weighing of the relevant considerations comes down to this. At all relevant times, the prevailing rule of law was that a lessor could withhold assent to a proposed assignment for any reason whatsoever. Mobil displayed considerable and justifiable reliance on that rule, which did not alter until two years later. The strength and extent of that reliance is only partially offset by Mobil's inability to foresee the nonjudicial portents of a change in the rule. By contrast, there is no evidence that plaintiff had any inkling of a *judicial* change of the rule. He was aware of the *legislative* modification of the rule embodied in Business and Professions Code section 21148. That modification, however, was accompanied by a solemn determination by the Legislature that it should *not* be retroactive. Public policy supporting the change will not be advanced by applying the change to completed contractual arrangements involving the stability of real property titles. As regards the fairness factor, we perceive no satisfying basis for making plaintiff the windfall beneficiary of a change he did not foresee or help bring about. Conversely, it is patently unfair to penalize Mobil for its nonconformity with standards which took effect only after it conscientiously determined the state of the law and relied upon it in reasonable good faith. Upon full reflection of the problem, we believe that it is appropriate to follow the Legislature's lead and adhere to its decision respecting the relative hardships and advantages of implementing the new standard. The salient equities and considerations of vested right support Mobil's claim that its conduct is to be judged in accordance with the rule of *Richard* v. *Degen & Brody, Inc.* (See *Peterson* v. *Superior Court, supra,* 31 Cal.3d 147 at pp. 152-153; *County of Los Angeles* v. *Faus, supra,* 48 Cal.2d 672 at pp. 680-681; *Cooley* v. *County of Calaveras, supra,* 121 Cal. 482 at p. 486.) Although we are not unmindful that it entails the temporary preservation and application of a discredited principle of law (see *Forster Shipbldg. Co.* v. *County of L. A., supra,* 54 Cal.2d 450 at p. 459; *Kawasaki Motors Corp* v. *County of Orange* (1983) 146 Cal.App.3d 780, 783 [194 Cal.Rptr. 608]; *Schettler* v. *County of Santa Clara, supra,* 74 Cal.App.3d 990 at p. 997), we are

compelled to conclude that the trial court erred in ruling that defendants' actions were to be evaluated by the *Cohen-Schweiso-Kendall* standards governing the exercise of a lessor's contractual right to refuse consent to an assignment of the contract.

The effects of this conclusion are manifold. Mobil's conduct with respect to plaintiff's proposed assignees was central to the causes of action submitted to the jury and covered by their verdict. Mobil's refusal to consent to assignment was the heart of plaintiff's breach of contract cause of action. The same conduct by Mobil was, to a lesser but still prominent extent, involved in the tort claims for intentional infliction of emotional distress and interference with prospective economic advantage, which formed the basis for the awards of punitive damages. The refusal to consent to an assignment also figured in plaintiff's cause of action based upon the PMPA, which was subsequently disallowed by the trial court. The error thus pervades the entirety of the verdict for compensatory and punitive damages, with the result that the ensuing judgment must be reversed.

## II-IX*

. . . . . . . . . . . . . . . . . . . . .

Those portions of the judgment providing that plaintiff recover damages, costs and interest from defendants Mobil Oil Corporation and James Edwards are reversed. The judgment is affirmed in all other respects. The orders made after judgment are also affirmed. The parties shall bear their respective costs on appeal.

Anderson, P. J., and Sabraw, J., concurred.

A petition for a rehearing was denied March 5, 1988, and the petition of plaintiff and appellant for review by the Supreme Court was denied May 5, 1988.

---

*See footnote, *ante,* page 389.